**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 09 2012, 8:49 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JUSTIN R. WALL**
Wall Legal Services
Huntington, Indiana

ATTORNEYS FOR APPELLEE:

**CHRISTINE REDELMAN**
Indiana Dept of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: A.B. AND P.B., Minor Children, | ) ) ) ) |
| E.B., Mother, | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) ) No. 35A04-1111-JT-629 |
| | ) |
| INDIANA DEPARTMENT OF CHILD SEVICES, | ) ) ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE HUNTINGTON SUPERIOR COURT
The Honorable Thomas M. Hakes, Judge
Cause Nos. 35C01-1103-JT-6, 35C01-1103-JT-7

**May 9, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

E.B. ("Mother") appeals the involuntary termination of her parental rights to her children, A.B. and P.B. Concluding that the trial court's findings fail to satisfy the requirements of Indiana Code § 31-35-2-4(b), we reverse the court's judgment and remand with instructions to enter additional findings to support the judgment in accordance with Indiana's termination statute.

**Facts and Procedural History**

Mother is the biological mother of A.B., born in January 2007, and P.B., born in September 2009.[1] The Huntington County office of the Indiana Department of Child Services ("HCDCS") became involved with Mother and the children in 2008 after receiving a referral that the family's home was in an unsafe and/or unsanitary condition. HCDCS caseworkers visited the home and observed: (1) "numerous piles of dog feces in every room upstairs;" (2) "trash, clothing, dirty diapers, and cigarette butts" littering the "entire" kitchen and living room floors; and (3) the only toilet in the home was "full of human waste and not functioning." Petitioner's Ex. 1.1.[2] In addition, there was no electricity in the lower level of the home, so an extension cord was being utilized to power a toaster and hot plate on the lower level of the home. By the next day, the home had been cleaned, but the toilets remained broken. In addition, Mother assured case workers that the family was moving that weekend.

---

[1] K.B. is A.B.'s biological father. K.M. is P.B.'s biological father. Both fathers voluntarily relinquished their parental rights to their respective child prior to the filing of the termination petitions herein. In addition, neither father participates in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

[2] Unfortunately, the pages of the Volume of Exhibits submitted on appeal were not enumerated. We therefore cannot cite to any specific page numbers throughout this Opinion.

Approximately one week later, HCDCS received another referral that the family had not moved and that the home was once again in an unsafe and unsanitary condition. A second assessment of the home revealed that the electrical and plumbing issues had not been resolved, dog feces was smeared on the kitchen floor, trash, clothing and other debris covered the living room floor, and the home now had a condemnation notice posted on the door. Additionally, it was reported that Animal Control had taken the family dogs to a local shelter.

As a result of its assessment, HCDCS filed a petition alleging A.B. was a child in need of services ("CHINS"). The child was so adjudicated in December 2008. Although the trial court allowed A.B. to remain in Mother's physical custody as an in-home CHINS, preliminary services were offered to the family. In January 2009, the trial court issued a dispositional order formally removing A.B. from Mother's legal custody and directing Mother to participate in and successfully complete a variety of services designed to help her maintain the safety, stability, and sanitary conditions of the family home. The court's dispositional order also directed Mother to participate in individual counseling to address her historical pattern of dating sex offenders, equip her with appropriate discipline techniques, and help her learn how to deal with stress. In addition, psychological testing for Mother was ordered to rule out any mental illnesses and to further address Mother's parenting deficiencies.

For the next several months, Mother refused to consistently participate in court-ordered reunification services. P.B. was born in September 2009. The next month, following another verified report of unsafe and unsanitary conditions in the family home,

3

P.B. was adjudicated a CHINS. Although HCDCS petitioned the court to remove both children from Mother's physical care at that time, the request was denied.

Mother's participation in reunification services continued to be sporadic and ultimately unsuccessful. For example, Mother refused to complete a psychological evaluation for approximately eighteen months after the trial court's order to do so. Although there were brief periods of time during which Mother cooperated with case workers and service providers, she was unable to consistently demonstrate an ability to implement the parenting techniques she was being taught. In addition, the family moved frequently and/or experienced several periods of homelessness, and Mother continued to engage in an on-and-off-again relationship with her domestic partner despite repeated episodes of domestic violence that oftentimes occurred in the presence of the children.

In January 2010, HCDCS again petitioned the trial court to modify its dispositional order and to remove the children from Mother's physical care. The trial court denied HCDCS's request. In April 2010, however, the children were placed in foster care due to the ongoing lack of stability in the family home. Although a three-month trial home visit was later attempted in September 2010, Mother returned the children to foster care later the same month after being involved in a domestic dispute and losing her housing.

In January 2011, another domestic incident occurred in the family home, and Mother was arrested on misdemeanor battery charges. Mother was later convicted and remained incarcerated until July 2011. Meanwhile, in March 2011 HCDCS filed

petitions under separate cause numbers seeking the involuntary termination of Mother's parental rights to both children.

A consolidated evidentiary hearing on the termination petitions was held in September 2011. During the hearing, HCDCS presented considerable evidence regarding Mother's failure to successfully complete a majority of the court-ordered reunification services, including individual counseling and home-based services, and that she remained unable to demonstrate she was capable of providing the children with a safe and stable home environment. Among other things, HCDCS presented evidence establishing Mother remained unemployed, never took responsibility for her role in the removal of the children from her care, and continued to struggle with anger management issues. In addition, Mother had resided in twelve different locations, including the Huntington County Jail, during the underlying proceedings. Although the evidence reveals that Mother eventually secured housing in October 2010 that appeared to be suitable for the children, the residence belonged to Mother's domestic partner, whom Mother continued to live with and be financially dependent upon despite the significant past incidents of domestic violence. Mother also never completed court-ordered home-based counseling and intensive family preservation services, but she continued to participate in at least some of these services at the time of the termination hearing.

As for the children, Guardian ad Litem Joseph Wiley indicated he was concerned about the pattern of violence in the family home, as well as Mother's anger issues and the potential for future neglect and abuse should the children be returned to Mother's care. Nevertheless, Wiley declined to offer an opinion as to whether termination of parental

rights was appropriate due to his recent appointment to the case. HCDCS family case manager Bobbie Lamb, on the other hand, did recommend termination of Mother's parental rights as in the children's best interests. Family Preservation Counselor Rosella Stouder likewise testified that she had numerous concerns pertaining to the lack of safety and sanitary conditions found in the various residences Mother lived in throughout this case. Stouder further confirmed that she remained concerned about the "underlying anger" and "control issues" that were prevalent in the family home. Transcript at 39. In addition, Stouder testified that Mother had informed her on "two or three occasions" that Mother's domestic partner had been "abusing" Mother and "the girls," and that three-year-old A.B. had been observed "masturbating." Id. at 42.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In November 2011, the trial court issued its judgment terminating Mother's parental rights to both children. Mother now appeals.

**Discussion and Decision**

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" Id. (quoting Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)). "Indeed[,] the parent-child relationship is 'one of the most valued relationships in our culture.'" Id. (quoting Neal v. DeKalb Cnty. Div. of Family & Children, 796 N.E.2d 280, 285 (Ind. 2003)). Nevertheless, parental rights are "not absolute and must be subordinated to the

6

child's interests when determining the proper disposition of a petition to terminate parental rights." Id. (citing In re D.D., 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), trans. denied). Thus, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id.

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. D.D., 804 N.E.2d at 265. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Here, the trial court made specific findings and conclusions in its termination order. When a trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).

In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

7

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). In addition, HCDCS has the burden of pleading and proving each element of Indiana Code § 31-35-2-4(b) by "'clear and convincing evidence'" before the trial court can involuntarily terminate parental rights. In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)).

Among other things, Mother asserts that she is entitled to reversal because the trial court's judgment does not comport with Indiana's termination statute in that there are no specific findings indicating that: (1) there is a reasonable probability the conditions leading to the children's initial removal and/or continued placement outside of Mother's care will not be remedied and/or continuation of the parent-child relationship poses a threat to the children's well-being; (2) termination of Mother's parental rights is in the children's respective best interest; and (3) HCDCS has a satisfactory plan for the future care and treatment of both children. See Ind. Code § 31-35-2-4(b)(2)(B)-(D). Although the State counters that HCDCS "presented sufficient evidence to support the conclusion that Mother's parental rights should have been terminated," the State nevertheless

8

concedes that "the juvenile court's order does not set forth legal conclusions consistent with Ind. Code § 31-35-2-4(b)(2)." Appellee's Brief at 23, 34.

Our review of the trial court's judgments reveals that although the court made thirty-one specific findings concerning Mother's failure to consistently participate in and benefit from court-ordered reunification services, inability to retain and implement the parenting techniques being taught to her by service providers, refusal to disengage from unhealthy and physically violent personal relationships, and ongoing inability to provide a safe and sanitary home environment, the court neglected to make any specific findings whatsoever specifically pertaining to the statutory elements delineated in Indiana's involuntary termination statute. See Ind. Code § 31-35-2-4(b)(2)(B)-(D). Termination of parental rights is of such importance that we must be convinced the trial court has based its judgment on proper considerations. Parks v. Delaware Cnty. Dep't of Child Servs., 862 N.E.2d 1275, 1280-1281 (Ind. Ct. App. 2007). Unfortunately, we cannot make such a determination based on the trial court's findings in this case. Although we recognize that the trial court is not required to make findings in termination cases unless specifically asked to do so by the parties, once the trial court decides to do so, it is bound under Indiana Trial Rule 52(A) to make findings that support its judgment. Id. at 1280; see also In re Estate of Inlow, 735 N.E.2d 240, 250 (Ind. Ct. App. 2000) (stating that special findings must contain the ultimate facts from which a trial court has determined the legal rights of the parties). Moreover, we are bound by the findings of the trial court on the issues covered and are not at liberty to look to other evidence to support its judgment. See generally Parks, 862 N.E.2d at 1280.

9

We recognize that this Court "generally assumes trial courts know and follow the applicable law." Ramsey v. Ramsey, 863 N.E.2d 1232, 1239 (Ind. Ct. App. 2007). This presumption can be overcome, however, if the trial court's findings "lead us to conclude that an unjustifiable risk exists that the trial court did not follow the applicable law." Id. As previously explained, Indiana Code § 31-35-2-4(b)(2) sets forth the specific requirements that must be alleged and proved by clear and convincing evidence in order to involuntarily terminate a parent-child relationship. Here, our review of the record in its entirety yields evidence that could arguably support either outcome, but we are in no position to reweigh such evidence. In failing to specifically find that (1) there is a reasonable probability that the conditions resulting in the children's removal will not be remedied or that continuation of the parent-child relationship poses a threat to the children, (2) termination of Mother's parental rights is in the children's best interests, and (3) HCDCS has a satisfactory plan for the future care of both children, the trial court's judgment simply does not provide us with reasonable assurances that the court has concluded HCDCS proved all of the statutory dictates of Indiana Code § 31-35-2-4(b)(2) by clear and convincing evidence. We therefore conclude that the trial court committed clear error.

We pause to note that our decision today should not be construed as a negative comment upon the sufficiency of the evidence supporting the trial court's current findings or ultimate decision to terminate Mother's parental rights. Moreover, in reaching this decision, we are keenly aware of the fact that both A.B.'s and P.B.'s sense of permanency and well-being hangs in the balance. Further delay in the final resolution of the

10

children's cases is most certainly regrettable. Nevertheless, under the facts of this case, we are constrained to reverse the trial court's judgment and remand this cause with instructions for the trial court to enter an amended order containing its findings and ultimate conclusions regarding the statutory requisites delineated in Indiana Code § 31-35-2-4(b)(2). See, e.g., In re J.Q., 836 N.E.2d 961, 967 (Ind. Ct. App. 2005) (concluding that trial court's judgment failed to adequately state its reasons for its disposition thereby necessitating reversal with instructions to "carefully follow the language and logic laid out by our legislature" in the CHINS and termination statutes); In re L.B. and S.C. v. Morgan Cnty. Dep't of Pub. Welfare, 616 N.E.2d 406, 407 (Ind. Ct. App. 1993) (stating that failure to ensure State fully complied with all conditions precedent to the termination of parental rights "constitutes fundamental error"), trans. denied.

Judgment reversed and remanded with instructions.

BAKER, J., and KIRSCH, J., concur.