ATTORNEY FOR APPELLANT
Amy Karozos
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
Marjorie A. Millman
Seymour, Indiana

# In the
# Indiana Supreme Court

**FILED**
Apr 24 2009, 1:50 pm

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

### No. 49S02-0902-JV-091

IN THE MATTER OF THE
INVOLUNTARY TERMINATION OF THE
PARENT-CHILD RELATIONSHIP OF
G.Y., MINOR CHILD, AND HIS
MOTHER, R.Y., AND HIS FATHER G.Y.

R.Y. (MOTHER),

*Appellant (Respondent below),*

v.

INDIANA DEPARTMENT OF CHILD SERVICES,

*Appellee (Petitioner below)*

AND

CHILD ADVOCATES, INC.

*Co-Appellee (Guardian Ad Litem)*

_____

Appeal from the Marion Superior Court, No. 49D09-0705-JT-020577
The Honorable Marilyn Moores, Judge
The Honorable Larry Bradley, Magistrate

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-0804-JV-394

_____

**April 24, 2009**

**Sullivan, Justice.**

The trial court terminated R.Y.'s parental rights on grounds that the conditions which resulted in her son G.Y.'s removal will not be remedied and that termination is in G.Y.'s best interests. The Court of Appeals affirmed. Concluding that the evidence does not clearly and convincingly demonstrate that R.Y.'s parental rights should be terminated, we reverse the judgment of the trial court.

## Background

R.Y. ("Mother") gave birth to G.Y. on April 23, 2004. Mother had been G.Y.'s sole caretaker during the first 20 months of his life and there are no allegations that she engaged in any criminal behavior during this period of time or that she was an unfit parent in any way. But in April, 2003, a year before G.Y.'s birth, Mother had delivered cocaine to a police informant. She was arrested and incarcerated for this offense in December, 2005, i.e., 32 months after the offense and when G.Y. was 20 months old. On January 4, 2006, after Mother's multiple attempts to place G.Y. with relatives and friends during her incarceration failed, the Marion County Division of the Indiana Department of Child Services ("State") filed a petition alleging that G.Y. was a Child in Need of Services ("CHINS") because Mother had been unable to make the appropriate arrangements for his care. G.Y. was placed in foster care.

In March, 2006, Mother pled guilty to Dealing in Cocaine as a Class B felony. The Jay Circuit Court entered a judgment of conviction and sentenced her to 12 years, with four years suspended to probation, i.e., eight years of executed time. In May, 2006, with Mother's consent, the Marion Superior Court, Juvenile Division, found G.Y. to be a CHINS. The court ordered continued placement in foster care and "Reunification with parent(s)" as "The Plan for permanency." (Vol. of Exs. at 11.) In July, 2006, the court held a dispositional hearing and thereafter issued a dispositional order directing that G.Y. continue in foster care and that Mother comply with the court's "Participation Decree." Id. at 13-17. The dispositional order again provided "Reunification with parent(s)" as "The Plan for Permanency." Id. at 14. Under the Participation Decree, Mother was ordered, in part, to obtain a source of income and suitable

housing, complete home-based counseling, a parenting assessment, parenting classes, and a drug and alcohol assessment. Id. at 16-17. She was also ordered to "[v]isit on a consistent, regular basis as recommended by counselor or caseworker." Id. at 17.

On May 18, 2007, the State filed a "Petition for Termination of the Parent-Child Relationship" between Mother and G.Y. (Appellant's App. 16-17.) The court held fact-finding hearings in January and February, 2008, at which time Mother's date of release from prison was May 30, 2010. (Tr. 6.) On March 26, 2008, the court entered Findings of Fact and Conclusions of Law, ordering Mother's parental rights involuntarily terminated. Mother appealed, contending that there was insufficient evidence to terminate her parental rights and that the State violated her due process rights when it failed to comply with statutory requirements during the termination process. In an unpublished memorandum decision, the Court of Appeals affirmed. R.Y. v. Marion County Dep't of Child Servs., No. 49A02-0804-JV-394, slip op., 895 N.E.2d 741 (Ind. Ct. App. Oct. 31, 2008). Mother seeks, and we grant, transfer.

**Discussion**

**I**

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. Bester v. Lake County Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005) (citing Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35 (1925); Meyer v. Nebraska, 262 U.S. 390, 399 (1923)). A parent's interest in the care, custody, and control of his or her children is "perhaps the oldest of the fundamental liberty interests." Id. (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000)). Indeed the parent-child relationship is "one of the most valued relationships in our culture." Id. (quoting Neal v. DeKalb County Div. of Family and Children, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize, however, that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. Bester, 839 N.E.2d at 147 (citation omitted). Thus, "[p]arental rights may be terminated when the parents are unable

3

or unwilling to meet their parental responsibilities." Id. (quoting In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004)).

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. Bester, 839 N.E.2d at 147 (citation omitted). We consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. (citation omitted). Here, the trial court entered findings of fact and conclusions thereon in granting the State's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. Id. (citation omitted). We will set aside the trial court's judgment only if it is clearly erroneous. Id. (citing In re Wardship of B.C., 441 N.E.2d 208, 211 (Ind. 1982)). A judgment is "clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." Id. (quoting In re Matter of R.J., 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005)).

Indiana Code § 31-35-2-4(b)(2) requires that a petition to terminate a parent-child relationship involving a CHINS must allege that:

> (A) one (1) of the following exists:
>
> > (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
> >
> > (ii) a court has entered a finding . . . that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
> >
> > (iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;
>
> (B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the homes of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

The State's burden of proof in termination of parental rights cases is one of "clear and convincing evidence."[1]  I.C. § 31-37-14-2; Bester, 839 N.E.2d at 148 (citation omitted).  "Clear and convincing evidence need not reveal that 'the continued custody of the parents is wholly inadequate for the child's very survival.'"  Bester, 839 N.E.2d at 148 (quoting Egly v. Blackford County Dep't of Pub. Welfare, 592 N.E.2d 1232, 1233 (Ind. 1992)).  "Rather, it is sufficient to show by clear and convincing evidence that 'the child's emotional and physical development are threatened' by the respondent parent's custody."  Id. (quoting Egly, 592 N.E.2d at 1234).

And the State must prove, by clear and convincing evidence, each and every element set forth in I.C. § 31-35-2-4(b)(2), (A)-(D).  In other words, if the State fails to prove any one of these four statutory elements, then it is not entitled to a judgment terminating parental rights.  See I.C. § 31-35-2-4(b)(2); Angela B. v. Lake County Dep't of Child Servs., 888 N.E.2d 231, 239 (Ind. Ct. App. 2008), trans. denied ("Without clear and convincing evidence to support each of the factors set forth in Indiana Code § 31-35-2-4(b)(2), we cannot affirm the termination of a parent-child relationship."); In re D.Q., 745 N.E.2d 904, 911 n.2 (Ind. Ct. App. 2001) (same).

---

[1] "The 'clear and convincing' standard is an intermediate standard of proof that: lies between a preponderance of the evidence and beyond a reasonable doubt which is required to find guilty in criminal prosecutions.  The burden of proof by clear and convincing evidence is not a burden of convincing you that the facts which are asserted are certainly true or that they are almost certainly true or are true beyond a reasonable doubt.  It is, however, greater than a burden of convincing you that the facts are more probably true than not true."  J.C.C. v. State, 897 N.E.2d 931, 934 (Ind. 2008) (citation omitted).  "The clear and convincing standard is employed in cases 'where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals to prove willful, wrongful and unlawful acts to justify an exceptional judicial remedy . . . .'"  Id. at 934-35 (quoting Estate of Reasor v. Putnam County, 635 N.E.2d 153, 159-60 (Ind. 1994)).  We believe that the Legislature has dictated this heightened burden of proof for termination of parental rights cases in recognition of their serious social consequences.

5

Mother contends that the State did not present clear and convincing evidence that termination of her parent-child relationship with G.Y. is in the child's best interests.

With reference to the child's best interests, the trial court made the following findings:

[G.Y.] has resided in the same foster care placement since January of 2006, at which time he less [sic] than two years old. He is doing exceptionally well and is very attached to his foster parents and foster brothers. This home is pre-adoptive.

Mother has consistent visitation at her prison facility. Visitation is monthly for a one to two hour period. There have been no concerns raised by the monitoring case manager, Wendy Budwig.

Termination of the parent-child relationship is in [G.Y.]'s best interests. Termination and subsequent adoption will provide [G.Y.] the opportunity to be adopted within the safe, stable home he sees as his. He has resided in the home for the last two years of his short life.

The [State's] plan for [G.Y.] is adoption by his foster parents. This plan is satisfactory for his care and treatment.

[G.Y.]'s Guardian ad Litem, Renee Fishel, agrees with [the State's] plan and that termination of the parent-child relationship is in the best interests of [G.Y.] because of the time that has elapsed and the stability and permanency [G.Y.] would receive. Ms. Fishel would have liked for Mother to have had continued visitation with [G.Y.] because she observed some kind of bond between them and thought it would be nice for [G.Y.] to know her in the future.

(Appellant's App. at 13-14.)

Based on these findings, the trial court concluded that "[t]ermination of the parent-child relationship is in [G.Y.]'s best interests so that he will be free for adoption where his needs will be met by a consistent caretaker in a permanent environment. To provide Mother additional time to be released from jail and try to remedy conditions would only necessitate [G.Y.] being put on a shelf instead of providing paramount permanency." Id. at 14.

More specifically, the court concluded that:

6

[m]other remains incarcerated and unavailable to parent. Upon her release, she will be on probation for an additional four years. Prior to reunification, she will have to complete a parenting assessment, parenting classes, and drug treatment classes. These services will need to be successfully completed, as well as Mother obtaining suitable housing and gainful employment, prior to a referral for home based counseling. During the twenty-six months of Mother's incarceration, she has taken one substance abuse education class, one parenting class and some college courses. Given Mother's pattern of criminal activity, resulting in periods of incarceration, it is unlikely that conditions will change to where Mother will remain available to parent.

Id. at 13.

We hold that the State did not present clear and convincing evidence to support this conclusion. We reach that result after examining the following four reasons that the trial court gave for concluding that termination of Mother's parental rights is in G.Y.'s best interests.

## A

We begin with the court's reason that termination is in G.Y.'s best interests because his mother will "remain unavailable to parent" because her "pattern of criminal activity" makes it likely that she will re-offend upon release. Our review of the record indicates that all of Mother's criminal history consists of offenses that were committed before G.Y.'s conception in 2003. After that time and for the first 20 months of his life, the record gives no indication that Mother was anything but a fit parent.

After Mother's incarceration for an admittedly very serious offense (that, to repeat, occurred before the child's conception), Mother agreed that her son was a CHINS. The juvenile court ordered her to participate in treatment services and, despite the physical impossibility of completing some of these requirements while incarcerated, the record shows that Mother took positive steps and made a good-faith effort to better herself as a person and as a parent. At the time of the termination hearing, she had completed an eight-week drug rehabilitation program entitled "Fourth Dimension Recovery." (Tr. 9-10.) Mother testified that the program focused on

7

"making amend[s] for your wrong . . . Like your children and your parents . . . people that you just hurt emotionally because of your use." Id. at 9. In addition to the large group classes, Mother testified that "we have our own individual counselors here." Id. at 10. At the time of the termination hearing, she was on the waiting list for phase II of the program. Id. Mother also testified at the termination hearing that even though she has a history of drug use, she has not used cocaine since 2003. Id. at 7-8.

The record also shows that Mother had completed a 15-week parenting class that discussed issues regarding "development of children" and "discipline." Id. at 11-12. She was actively participating in "an inmate to work mate program through Arrowmarks," which results in an apprenticeship, certification, and job placement after release from prison. Id. at 11. In addition, she was in the midst of her second semester working towards an associate's degree and had started a culinary arts certification program. Id. at 10, 25. Mother testified that "when I get my associates degree next May [2008], it'll move it [her release date] back to 2009." Id. at 24. At oral argument, Mother's counsel confirmed that her projected release date is now June, 2009, and may even be as early as May.

We do not find the likelihood of Mother reoffending to be a sufficiently strong reason, either alone or in conjunction with the court's other reasons, to warrant a conclusion by clear and convincing evidence that termination of Mother's parental rights is in G.Y.'s best interests.

**B**

We next review the trial court's reason that termination is in G.Y.'s best interests because "[t]o provide Mother additional time to be released from jail and try to remedy conditions would only necessitate [G.Y.] being put on a shelf instead of providing paramount permanency." (Appellant's App. 14.) The "put on the shelf" expression does not appear to us to be particularly apt here where the placement appears to have been producing very positive results. But we understand the court to mean that it would not be in the child's best interest for G.Y. to have to wait on his mother's release and subsequent compliance with the requirements of its Participation Decree. Id. The court specifically mentions its concerns over the following of such

8

requirements: a parenting assessment, parenting classes, drug treatment classes, "obtaining suitable housing and gainful employment," and home-based counseling. Id. at 13.

While it true that Mother will be serving four years of probation after her release and that she has yet to complete all the services required for reunification, the record shows that she has made a good-faith effort to complete the required services available to her in prison.[2] As discussed supra, she has completed a drug treatment class, engaged in individualized drug counseling, and completed a parenting class. In addition, contrary to the trial court's findings, Mother has obtained "suitable housing" and "gainful employment" upon her release. She testified at the termination hearing that she has secured a full-time job through "Arrowmark" and through "Our Vision." (Tr. 21.) She also testified that either her family or the "Bonner Program" would provide a house for her and G.Y. to live in. Id. at 21-22. The trial court's finding that Mother had not completed either a parenting assessment or home-based counseling is tempered by the fact that these services were not available to her while she was incarcerated.[3]

In addition to completing those requirements for reunification that were available to her in prison, Mother has taken additional steps to provide permanency for G.Y. upon her release. When asked about her intentions after release from prison, she testified at the termination hearing that she will graduate with her associate's degree by the time she leaves the "Inmates Workmate Program." Id. at 21. She planned to start college and attain her bachelor's degree. Id. at 21-22. Her future plans also include completing "a phase II substance abuse program" and a culinary arts certification. Id. at 24-25. When confronted with her criminal history at the termination hearing, Mother acknowledged that before her most recent incarceration she had

_____

[2] The court's "Participation Decree" lists requirements for reunification. (Vol. of Exs. at 16-17.) In relevant part, these include Mother providing a source of income and suitable housing; and completing a parenting assessment, parenting classes, a drug and alcohol assessment, and home-based counseling. Id. When asked what Mother needed to do to be reunified with G.Y., State caseworker Sharon Bowland responded, "She would need to complete the services through our, our agency, and that would be . . . parenting classes. That would be a drug treatment class. That would be a parenting assessment, and then any other services that the assessment would say that she needed to do." (Tr. 27.) Bowland testified, however, that since Mother was incarcerated, the State was unable to provide a parenting assessment and other "normal services." Id.

[3] See supra n.3. The State's caseworker Sharon Bowland also testified that home-based counseling was "the last piece that we put into place" and that Mother would "need to be out of prison" to receive this service. (Tr. 27.)

9

"low self-esteem . . . and never pursued my education." Id. at 22. However, "now that I'm doing it, I know . . . that I'm better than the life that I live. And I . . . have a very good support system. And everybody's obligated to change . . . and I'm not gonna lose my son over . . . this stupid life that I was living, no. I'm not. I have kids that need me." Id.[4]

We do not find the amount of time that it will likely take Mother to comply with the conditions of the court's Participation Decree to be a sufficiently strong reason, either alone or in conjunction with the court's other reasons, to warrant a conclusion by clear and convincing evidence that termination of Mother's parental rights is in G.Y.'s best interests.

## C

We next review the trial court's reason that termination is in G.Y.'s best interests because G.Y. has a closer relationship with his foster parents than he does with his mother. The trial court found that "[G.Y.] has resided in the same foster care placement since January of 2006, at which time he less [sic] than two years old. He is doing exceptionally well and is very attached to his foster parents and foster brothers." (Appellant's App. 13.) By comparison, the court said, "Mother has consistent visitation at her prison facility. Visitation is monthly for a one to two hour period. There have been no concerns raised by the monitoring case manager, Wendy Budwig." Id.

The record shows that since her incarceration Mother has maintained a consistent, positive relationship with G.Y. The State's caseworker, Sharon Bowland, testified at the termination hearing that Mother "has been pretty consistent in maintaining that she wants to maintain contact with [G.Y.]." (Tr. 30.) They had shared visitations with one another once a

---

[4] See Bester, 839 N.E.2d at 152 (Father testified that he was once a member of a street gang, but that he no longer engaged in gang activity. He also testified that he hadn't used any illegal drugs since his son was born. This Court noted that "[t]he evidence of record admittedly shows a young man with a troubled past. However by the time of the termination proceedings, and apparently for at least three years before that date, Father has conducted himself in a manner consistent with assuring that his son would be exposed to a healthy drug free environment." We held that "the existence of Father's past criminal history does not demonstrate that the continuation of the parent-child relationship between Father and Child poses a threat to Child's well being.").

10

month for "at least a year." Id. at 29. The visits ranged from two to four hours. Id. at 58-59. The State's case manager, Wendy Budwig, who accompanied G.Y. on five occasions to visit Mother, testified that "[t]he visits went well." Id. at 60. She observed "a lot of interacting . . . mom would sit with him and do whatever he was doing, and interact with him." Id. Guardian ad Litem Renee Fishel observed G.Y.'s visitation with Mother for two hours and testified that "[t]heir interactions were appropriate. They were very playful with one another. They seemed to have a relationship." Id. at 54. In addition to these visitations, Mother has sent cards, pictures, and letters to G.Y. in an attempt to connect with him. Id. at 21.

We attach significance as well to the evidence in the record of Mother's commitment to reunification with G.Y. from the very point of her arrest. Within two days of her arrest, she had made arrangements for her sister to take care of him while she was incarcerated. Id. at 15. During the CHINS proceedings, she attempted to arrange foster care first with her sister, and then with a friend. Those attempts failed when neither of these individuals completed the required foster care classes. Id. at 18-19. Next, a "friend of the family" attempted to execute an "open" adoption which would have left it open for Mother to visit G.Y. at her discretion. This did not materialize because of the friend's medical condition. Id. at 19. Her sister then unsuccessfully filed for placement. Id. At the time of the termination hearing, her mother had requested placement. Id. at 20. Mother testified at the termination hearing that it was in the child's best interest "to be with my family. To know his birth family . . . To be taken care of and loved, and know that he's taken care of and loved by his family." Id. at 8.

We do not find the fact that G.Y. currently has a closer relationship with his foster parents than he does with Mother to be a sufficiently strong reason, either alone or in conjunction with the court's other reasons, to warrant a conclusion by clear and convincing evidence that termination of Mother's parental rights is in G.Y.'s best interests.

**D**

Lastly, we review the trial court's reason that termination is in G.Y.'s best interests because of his general need for "permanency" and "stability." This reason was based upon the

11

testimony of the State's caseworker, Sharon Bowland, and Guardian ad Litem Renee Fishel that termination of the parent-child relationship was in G.Y.'s best interest because he needed "permanency" and "stability." Id. at 28, 55. But Fishel qualified her recommendation. She testified that "looking out for [G.Y.]'s best interest, I'd like to see some . . . future agreement between the two parties that would include future visitation, contact with his biological mother, so he knows who she is." Id. at 55. Fishel's recommendation was based on her observation that "they appear to have a type of bond, a mother/child bond. They were very appropriate . . . Interaction was generated on both sides. From [G.Y.] to his mom, from mom to [G.Y.] . . . It would be nice for [G.Y.] to know who his mother is in the future." Id. at 57.

Permanency is a central consideration in determining the best interests of a child. In our case, however, G.Y. is under the age of five and Mother's release from prison is imminent. Particularly given the highly positive reports about the quality of the placement here, we are unable to conclude that continuation of the CHINS foster care arrangement here will have much, if any, negative impact on G.Y.'s well-being. We agree with Mother that "there was no evidence presented to show that permanency through adoption would be beneficial to [G.Y.] or that remaining as a foster care ward until he could be reunited with his mother would be harmful to [G.Y.]." (Appellant's Pet. to Transf. at 6.) This is especially true given the positive steps Mother has taken while incarcerated, her demonstrated commitment and interest in maintaining a parental relationship with G.Y., and her willingness to continue to participate in parenting and other personal improvement programs after her release.

We do not find that G.Y.'s need for immediate permanency through adoption to be a sufficiently strong reason, either alone or in conjunction with the court's other reasons, to warrant a conclusion by clear and convincing evidence that termination of Mother's parental rights is in G.Y.'s best interests.

**Conclusion**

We reverse the judgment of the trial court.

12

Shepard, C.J., and Dickson and Rucker, JJ., concur.

Boehm, J., dissents with separate opinion.

**Boehm, Justice, dissenting.**

I respectfully dissent and agree with the Court of Appeals that the trial court's judgment terminating the mother's parental rights should be affirmed.

The majority reviews a number of factors cited by the trial court and finds them insufficient to support the trial court's judgment that termination should be ordered. These include the likelihood that the mother will reoffend, the effect on the child of an additional period of instability, the mother's new job and living facilities when she is released, the child's bonding with his foster parents in the two years he has spent with them, and the degree of the mother's involvement with the child while she was incarcerated. Each of these ultimately turns on a judgment as to the credibility of the witnesses as to both their accounts of past events and, importantly, their evaluation of the mother's future ability to parent and the child's ability to thrive. I believe an appellate court should be very reluctant to conduct its own assessment of the cumulative effect of these factors on the child and the mother's likelihood of addressing the problems that led to the dispositional order. Similarly, the reliability of the guardian ad litem's judgment is a matter as to which we should defer to the trial court in the absence of a procedural error or a clearly erroneous assessment of the facts.

I certainly agree that there is an unfairness in a CHINS dispositional order that includes directives to the mother that she is incapable of fulfilling while incarcerated. But I read the trial court's order as turning on the child's best interests and the determination that the conditions leading to the child's removal will not be remedied—not the mother's failure to comply fully with the dispositional order. In my judgment, the assessment of these factors by the trial court is not clearly erroneous, and therefore should be affirmed.