**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 05 2012, 8:56 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ANDREW K. PORTER**
Feavel Law Office
Vincennes, Indiana

ATTORNEYS FOR APPELLEE:

**GARA U. LEE**
DCS, Local Office in Knox County
Vincennes, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: A.T., Minor Child, <br><br> M.T., Father, <br><br>    Appellant-Respondent, <br><br>        vs. <br><br> INDIANA DEPARTMENT OF CHILD SERVICES, <br><br>    Appellee-Petitioner. | ) ) ) ) ) ) ) ) ) ) No. 42A04-1203-JT-118 ) ) ) ) ) ) |

APPEAL FROM THE KNOX SUPERIOR COURT
The Honorable W. Timothy Crowley, Judge
Cause No. 42D01-1008-JT-24

**December 5, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

M.T. ("Father") appeals the involuntary termination of his parental rights to his child, A.T. Concluding that there is sufficient evidence to support the trial court's judgment, we affirm.

**Facts and Procedural History**

Father is the biological parent of A.T. Father was married to A.T.'s mother, J.T. ("Mother"), when A.T. was born in July of 2000,[1] but he raised A.T. as a single parent since A.T. was very young. The evidence most favorable to the trial court's judgment shows that, on April 9, 2009, Father contacted the Knox County office of the Department of Child Services ("KCDCS") because he had no electricity or water and he could no longer care for A.T. He stated that he had heard from several persons that A.T. had been masturbating and that she had become more deceptive. A.T. was taken into protected custody and placed in foster care.

That same month, A.T. was adjudicated a child in need of services ("CHINS"). A dispositional hearing was held in May of 2009, after which the trial court ordered Father to participate in visitation with A.T. on a consistent basis, to participate in home-based therapy and parent-aid sessions with Ireland Home Based Services, to obtain and maintain housing for him and A.T., and to obtain a verifiable means of income. In a separate Financial Obligation Order, Father was directed to pay $25 per week in child support. Mother's whereabouts were unknown and, thus, she was not subject to the dispositional order.

---

[1] Mother appeared at the termination proceedings and voluntarily terminated her parental rights. She does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent to Father's appeal.

Father and A.T. began receiving services through the CHINS case. Father participated in home-based therapy and parent-aid sessions. He secured an apartment and, "obtained a means of income at times." Appellant's Brief at 9. Father also consistently visited with A.T., although he did not make regular child support payments.

During her counseling sessions, A.T. disclosed that Father had molested her.[2] Father denied the molestation. KCDCS investigated and substantiated A.T.'s allegation that Father had touched her inappropriately. In September of 2009, the court ordered Father to participate in a psychological evaluation and individual therapy with the Samaritan Center. Father was evaluated by the Samaritan Center, but the facility lacked a qualified therapist to provide sex offender treatment. Father continued with in-home therapy but did not address the sex abuse issue.

In March of 2010, KCDCS filed its Motion to Modify Dispositional Decree, requesting that Father be ordered to participate in sex offender evaluation and treatment. KCDCS also filed an amended CHINS petition, adding the sex offense as a reason for the CHINS action. In August of 2010, KCDCS petitioned for the termination of the parent-child relationships of A.T. with Father and Mother.

After a contested fact-finding hearing on the amended CHINS petition, held in September of 2010, the trial court again adjudicated A.T. a CHINS, specifically finding that A.T. was the victim of a sex offense under Indiana Code § 35-42-4-3 (child molesting) and that Father was the perpetrator of the sex offense. In its second

---

[2] A.T. stated that Father had placed his finger inside her private area. She wrote in her journal that Father had also made her squeeze his penis after which "some peach stuff came out and it got on her hand and her rug." Exhibit 73 at 3.

dispositional order, the trial court noted that Mother had appeared by counsel. The court directed Father to participate in sex offender treatment and to follow all recommendations of the treatment program.

In early 2011, Father was referred to Luzio & Associates Behavioral Services in Evansville for sex offender treatment. Father did not complete the evaluation process and, thus, received no treatment. Mother participated in visitation with A.T., but her participation was sporadic. In March of 2011, the trial court approved a permanency plan of termination of the parent-child relationships. Thereafter, Father moved to strike A.T.'s testimony from the September 2010 fact-finding hearing and requested a new hearing. KCDCS objected, and the court denied Father's motions. Father voluntarily dismissed his subsequent appeal of the court's CHINS adjudication.

The trial court held three hearings on the termination petitions in October and November of 2011. In November, the court also heard argument on KCDCS's motion to suspend visitation. Testimony showed that A.T. was suffering from post-traumatic stress disorder, major depression, and attention deficit hyperactivity disorder. Caregivers described how A.T. had regressed into infantile and destructive behaviors such as thumb-sucking, hiding, and pulling out facial and pubic hair. A.T. exhibited a particularly high level of anxiety before visitations, especially those with Mother. Evidence demonstrated that A.T. was at a critical stage and that a failed reunification attempt could result in a full-blown reactive attachment disorder. The trial court took matters under advisement and, in February of 2012, issued its order terminating Father's parental rights.

**Discussion and Decision**

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009), reh'g denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Where, as here, the trial court entered findings and conclusions thereon, we apply a two-tiered standard of review. Id. First we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied, cert. denied, 534 U.S. 1161 (2002). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or if the conclusions do not support the court's judgment. In re G.Y., 904 N.E.2d at 1260.

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. H.G. v. Ind. Dep't of Child Serv., 959 N.E.2d 272, 288 (Ind. Ct. App. 2011), reh'g denied, trans. denied. A parent's interest in the care, custody, and control of his child is "'perhaps the oldest of the fundamental liberty interests.'" Id. (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000)). Parental rights are not absolute, however, for they must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. Id. Accordingly, parental rights may be terminated if the parents are unable or unwilling to meet their parental responsibilities. Id. Moreover, a trial court need not wait

5

until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases is "one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d at 1260-1261 (quoting Ind. Code § 31-37-14-2). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added). Father's challenge relates to subsection (b)(2)(B) and (C) of the termination statute cited above.

### I. Conditions Remedied/Threat to Well-Being

Indiana Code § 31-35-2-4(b)(2)(B) requires the State to establish by clear and

convincing evidence only one of the three requirements of subsection (b)(2)(B). Because we find it to be dispositive, we limit our review to Father's allegations of error pertaining to subsection (b)(2)(B)(ii), namely, whether KCDCS presented clear and convicting evidence establishing a reasonable probability that the continuation of the parent-child relationship poses a threat to A.T.'s well-being.

In terminating Father's parental rights, the trial court made the following findings:

[A.T.] suffers from several mental health issues and has been exhibiting regressive child-like behavior. She is struggling academically and behaviorally in school. [A.T.] is engaging in self-harming behavior, pulling hairs in her eyelashes, eyebrows, and pubic area. Dr. Melissa Umali, the [psychologist] treating [A.T.], believes that [A.T.] is suffering from reactive attachment disorder which was likely caused by abuse or neglect in early childhood. Dr. Umali expressed concerns that [A.T.'s] mental health condition was at a critical stage, and that a permanent resolution of [A.T.'s] relationship with her parents would help resolve her mental health issues.[3]

Apellee's Appendix at 3. Based upon the above, the court concluded that the State "established by clear and convincing evidence that . . . there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of [A.T.]." Id. A thorough review of the record reveals that evidence supports the trial court's findings.

Dr. Umali, a clinical psychologist working mainly with children, saw A.T. face-to-face five times and supervised A.T.'s case for the Debra Corn Agency. Dr. Umali testified that A.T. first presented with minor behavioral problems and learning

---

[3] We recognize that findings merely reciting a witness's testimony or opinion are not true findings of basic fact. Parks v. Delaware Cnty. Dep't of Child Serv., 862 N.E.2d 1275, 1279 (Ind. Ct. App. 2007). Rather, the trier-of-fact must adopt the testimony of a witness to render a finding of fact. However, the parties do not question this aspect of the trial court's order, and we observe that, as in Parks, the inclusion of statements that are not findings should be considered as mere surplusage where proper findings support the trial court's decision.

difficulties. By April of 2011, however, she was exhibiting regressive behavior. Dr. Umali diagnosed A.T. with post-traumatic stress disorder ("PTSD"); major depression, Attention Deficit Hyperactivity Disorder ("ADHD"), and possible attachment disorder. She stated that A.T. does not trust Father and does not feel secure or safe with him; thus, A.T. has high levels of anxiety.

Dr. Umali testified that A.T.'s PTSD symptoms developed from what she assumed was a sexual abuse that needs to be addressed. The psychologist had not seen a child out of the home this long successfully reunited and she believed that, because A.T. was at a critical point, if reunification were unsuccessful, it would cause significant psychological damage. She elaborated: "[Y]ou're talking about a full-blown reactive attachment disorder developing. And as into adulthood that tends to develop into major personality issues, causes lifelong depression and anxiety, it's . . . I mean, it's very damaging." Transcript at 231. Dr. Umali explained that children with reactive attachment disorder "have no sense of what is appropriate, right or wrong." Id. at 232. She continued:

> Typically girls grow up into women that have relationships with abusive men, they have children with multiple partners, they end up depressed, unable to work, drugs, become involved in sexually abusive relationships. And then, they themselves are unable to care for their children, because they don't have a sense of how to do that, how to love anyone else.

Id. at 233. Regarding Father's continued visitation, Dr. Umali stated that "important things have not occurred in order to make the reunification successful so, to continue the visits, at this point, and to continue allowing her to stay in foster care[,] it's going to psychologically traumatize [A.T.] even further." Id. at 246-247.

In her report filed in October of 2011, Guardian ad Litem ("GAL") Jill Doggett

8

also wrote of the regression in A.T.'s behavior since the last termination hearing. A.T. was previously on the honor roll but, at the relevant time, she was struggling academically and behaviorally. She noted that A.T. was pulling out her eyelash and eyebrow hair and, when confronted, began pulling out her pubic hair because it could not be seen. At the termination hearing, the GAL expressed doubts about Father's ability to provide the therapy, treatment and counseling that will be a component of A.T.'s life for a long time. The GAL opined that continued uncertainty is harmful to A.T. She recommended termination of Father's parental rights.

Elizabeth Maines, a family case manager with the KCDCS, had been involved with A.T.'s case since June of 2009. She testified that continuation of the parent-child relationship poses a threat to A.T.'s well-being. Maines further testified that A.T. is "a lot different child now with her behaviors as she's getting older, things are changing with . . . her behaviors are getting worse. There needs to be someone that is very proactive in her treatment." Id. at 53. Maines had not seen that type of motivation from Father at any point. She added, "We don't really know the risks that would be if [A.T.] was placed back with [Father] of her being sexually abused again or something else happening to her." Id. at 54.

Britney Wagler of the Debra Corn Agency counseled A.T. once a week for forty-five to fifty minutes since June of 2010. Wagler confirmed that A.T. had fallen behind in school, that she has nightmares, incidences of bedwetting and removing facial and pubic hair. A.T. had been seen by a psychiatrist, who prescribed medications for "sleeping," for ADHD, and for depression and anxiety. Id. at 139-140.

9

Clear and convincing evidence need not demonstrate that continued custody of the parent is wholly inadequate for the child's very survival. In re G.Y., 904 N.E.2d at 1261. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development is threatened by a parent's custody. Id. After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the trial court's findings and, in turn, those findings support the court's conclusion that continuation of the parent-child relationship poses a threat to A.T.'s well-being.

## II. Best Interests

We next consider Father's argument that KCDCS failed to prove that termination of his parental rights is in A.T.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Department of Child Services and consider the totality of the evidence. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). In so doing, the court must subordinate the interests of the parent to those of the child. Id. "Permanency is a central consideration in determining the best interests of a child." In re G.Y., 904 N.E.2d at 1265. In addition, we have held that the recommendations of a child's caseworker and guardian ad litem that parental rights should be terminated support a finding that termination is in the child's best interests. In re A.B., 887 N.E.2d 158, 170 (Ind. Ct. App. 2008).

Here, the trial court found:

Both parents have failed to prove that they can adequately provide for [A.T.]. . . . [Father] failed to follow through with the sex offender evaluation and treatment. Dr. Umali has testified that the continuation of the parent-child relationship is not in the best interests of [A.T.]. The

10

> Guardian Ad Litem, Jill Doggett, has concluded that termination of parental rights is in [A.T.'s] best interests.
>
> While both [Mother] and [Father] may love their daughter, neither parent has been able, or willing, since the removal of [A.T.], to do the things necessary to bring about reunification with the child.

Appellee's Appendix at 4. The court then concluded that termination of Father's parental rights is in A.T.'s best interests. Again, the trial court's findings are supported by the evidence.

During termination hearings, Dr. Umali testified that termination was in A.T.'s best interests because of the length of time A.T. had been removed from Father's home, Father's failure to follow through with the sex offender evaluation and treatment, and A.T.'s deteriorating mental health. Specifically, Dr. Umali opined that successful reunification requires that the offender admit what occurred and apologize. She continued, "[C]hildren don't make allegations of sexual abuse if there's not some sort of emotional problem going on in the family." Transcript at 224.

Family case manager Maines agreed that termination was in A.T.'s best interests. GAL Doggett reported:

> The GAL is very concerned about [A.T.]. She is really struggling in many areas. She has been in care for over two years and, at this point, does not have much of a relationship with either one of her natural parents. . . . [A.T.] truly believes that [Father] molested her. [A.T.] has clearly told the GAL that she does not want to be reunified with either of her parents.

Exhibit F at 11. She recommended termination of Father's parental rights.

Still, Father challenges the trial court's finding that he was unwilling or unable to do what was necessary for reunification. He insists that he substantially complied with

all court directives except for sex offender assessment and treatment. He maintains that he was unable to complete that requirement because he could not afford the fifty-mile trip to Evansville. Father also complains that he did not receive family therapy.[4]

We are reminded that the law concerning termination of parental rights does not require the Department of Child Services to offer services to the parent to correct deficiencies in childcare. See In re B.D.J., 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). Thus, termination of parental rights may occur as long as the elements of Indiana Code § 31-35-2-4 are proven by clear and convincing evidence. Id. Nevertheless, here, Father did cooperate with KCDCS and participate in home-based services. But cooperation is not everything; rather, according to family case manager Maines, there must be a change in the parent so that the parent follows through without direction from KCDCS. That did not happen. Similarly, Father regularly visited with A.T. in accordance with the court's order, but there was a lack of both physical and verbal affection and a lack of "honest relaxation." Transcript at 126. And A.T. exhibited more anxiety before visitations. Thus, regular visitation did not in itself compel reunification.

Regarding the sex offender evaluation, Father consistently denied the molestation. He began the required sex offender assessment at Luzio & Associates but cancelled appointments and did not complete the evaluation. The State's contract with Luzio expired and, when funds were later available, Father had cancelled enough appointments

---

[4] In particular, Father challenges the trial court's finding that he "declined the opportunity to attend family therapy because he did not want to travel to Princeton, Indiana for the counseling." Appellee's Appendix at 3. That finding was entered in support of the court's conclusion that there is a reasonable probability that the conditions resulting in A.T.'s removal or the reasons for her placement outside the home would not be remedied. Thus, we need not consider it here. Nevertheless, we observe that Father "believed" that the KCDCS made a referral for family counseling that required his traveling to Princeton, which he was unable to do. Transcript at 329.

that the facility would not see him unless payment was made in advance, a financial requirement that KCDCS could not meet. Father did not seek alternative services.

We also find significant the testimony of Jonathan Straus, the county manager of Knox and Gibson Counties for Ireland Home Based Services. Straus worked with Father as a therapist for four months in 2010 and, prior to that, supervised Father's counselors. Straus testified that he had a certification in sex offender treatment, but the focus of Father's therapy was anger management because Father was unwilling to address the sexual molestation. Straus further stated that Father had nineteen scheduled appointments in his home and attended nine of them. Father showed little progress and never actively sought help or advice in how to deal with reunification.

Based on the totality of the evidence, including Father's failure to complete or benefit from sex offender therapy and his failure to seek alternative treatment, coupled with testimony from the family case manager, GAL, and Father's therapist, we conclude that the State presented clear and convincing evidence to support the trial court's conclusion that termination of the parent-child relationship is in A.T.'s best interests. Father's arguments to the contrary amount to an impermissible invitation to reweigh the evidence.

This court will reverse a termination of parental rights "'only upon a showing of "clear error"—that which leaves us with a definite and firm conviction that a mistake has been made.'" Matter of A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

BAILEY, J., and VAIDIK, J., concur.