## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 24 2017, 9:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.F. (Child) and M.F. (Father);

M.F. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

April 24, 2017

Court of Appeals Case No.
15A04-1608-JT-1805

Appeal from the Dearborn Circuit Court

The Honorable James D. Humphrey, Judge

Trial Court Cause No.
15C01-1603-JT-10

**May, Judge.**

[1] M.F. ("Father") appeals the termination of his parental rights to J.F. ("Child"). He argues the evidence was insufficient to support termination. We affirm.

## Facts and Procedural History

[2] Child was born to Father and T.W. ("Mother")[1] on June 26, 2012. Child has Down's Syndrome and requires special care. On December 18, 2014, the Department of Child Services ("DCS") received a report of neglect of Child and safety concerns due to frequent domestic violence occurring between Father and Mother (collectively, "Parents"). The report indicated Father was physically abusive toward Mother in the presence of Child, but not physically abusive to Child.

[3] When DCS first became involved with the family, Parents were cooperative with DCS and allowed DCS case managers to enter the home and to observe and speak with Child. Because Parents were cooperative, DCS allowed Child to remain in the home with Parents while it conducted a thirty-day initial assessment of the home environment.

[4] As part of DCS's initial assessment, it reviewed Parents' criminal histories and hospital records. DCS discovered Mother was arrested in June 2014 and

---

[1]Mother voluntarily relinquished her parental rights on June 23, 2016, and does not participate in this appeal.

charged with criminal mischief for breaking into Father's home while intoxicated. DCS also reviewed hospital records showing Mother received treatment on June 20, 2014, for injuries she sustained on her hands and wrists. The treatment records indicated the cause of the injuries was blunt force trauma and Mother had reported Father hit her with a baseball bat.[2]

[5] Over the course of DCS's initial assessment of the home environment, Parents became less cooperative, until neither parent would allow DCS case managers to enter the home or see Child. On February 25, 2015, DCS filed a petition alleging Child was a Child in Need of Services ("CHINS"). On March 4, 2015, the court held an initial hearing on DCS's petition. Parents appeared. At the hearing, DCS requested permission from the court to remove Child from the home due to Parents' lack of cooperation and DCS's growing concerns of domestic violence based on Mother having filed for a protective order from Father in January 2015.[3] At the time of the hearing, Child was staying at a relative's home in Ohio. Finding it was in the best interest of Child, the court granted DCS's request to remove Child. DCS removed Child from the Ohio relative's home on March 4, 2015, and placed him in a foster home. Child never returned to Parents' care.

---

[2]The record does not indicate Father was charged for this act.

[3]The record indicates Mother filed for a protective order sometime in January 2015 but did not "follow through" with the order. (Ex. Vol. I at 64.)

On May 21, 2015, the court held a fact-finding hearing on the CHINS petition. Parents appeared in person and by counsel. DCS and Parents signed a written agreement stipulating Child was a CHINS. Parents agreed that, as a result of the conflicts in the home, Child's physical or mental condition may be seriously impaired or seriously endangered. Based on Parents' admissions, the court entered an order adjudicating Child a CHINS on June 4, 2015.

On June 10, 2015, the court held a dispositional hearing. The court entered a dispositional order for the formal removal of Child from Parents' care and granted DCS wardship of Child. The court ordered Child remain in his current foster care placement. The court ordered Parents to participate in homebased therapy, attend all regularly scheduled visitations with Child, attend an Intensive Family Preservation program, complete substance abuse assessments and counseling through Community Mental Health Center ("CMHC"), maintain suitable, safe, and stable housing, maintain legal and stable income, obey the law, undergo random drug screenings, undergo psychological evaluations, undergo a domestic violence assessment, and provide Child with a safe, secure and nurturing environment free from abuse and neglect. The court scheduled a hearing to review Parents' progress on September 21, 2015.

On July 15, 2015, Father was arrested and charged with strangulation and domestic battery against Mother. He was released on bond. As a condition of his pre-trial release, the court ordered Father to have no contact with Mother and ordered Father to attend counseling at CMHC based on DCS's recommendation. On August 19, 2015, Father was arrested for violating the no

contact order when he was pulled over for a traffic stop and Mother was in the car. Father was charged with invasion of privacy based on the violation.

[9] The juvenile court held the periodic review hearing on September 21, 2015. The court noted Father's arrests for strangulation and battery, the court's imposition of the protective order, and Father's subsequent violation of that order. The court further noted Father had not, as of the date of the hearing, attended any counseling sessions as recommended by DCS. Father had been inconsistent with attending visitation and reported "working a lot of hours." (Ex. Vol. I at 86.) Supervised visits had been moved to a room that had an observation room so that DCS could observe Father's interactions with Child. DCS reported Father "use[d] the visits as a time to communicate with the service provider rather than focusing on the child[,]" (*id.*), that he "struggle[d] to stay for the entire two hours" when he did visit, (*id.*), and Father "report[ed] that he must return to work and [could not] stay for the full visits." (*Id.*)

[10] As to Mother, the court found she had been "moving from place to place," (*id.*), and although CMHC offered to help Mother find housing, Mother refused help. Mother had tested positive for THC on July 31, 2015, and for amphetamine and Methamphetamine on August 28, 2015. At the time of the hearing, Mother was living with a friend in Batesville, Indiana, and was employed. The court noted Child continued to "grow and develop," (*id.* at 183), in his foster care, was attending pre-school, and was "doing very well." (*Id.*) The court indicated the permanency plan remained reunification.

[11] In November 2015, Father signed a pretrial diversion agreement with the State under Cause Number 15D02-1507-0233 for his strangulation charge. That agreement required he not commit any criminal offenses for thirty months and not have contact with Mother.

[12] The court held a periodic review hearing on December 17, 2015. Both Parents appeared. Since the last review hearing, Parents were tested for drugs five times. Mother tested positive for illegal drugs, including amphetamine and Methamphetamine, all five times, but Father tested negative for any drug use each time. Father still had not attended or made any appointments for individual counseling. The court noted due to Father's inconsistency with attending supervised visits, he was sent a letter with the visitation schedule and required to call twenty-four hours in advance of the visit to confirm his attendance. The court found Parents "ha[d] not enhanced their ability to fulfill their parental obligations." (*Id.*) The court ordered Father to engage in individual therapy at CMHC. The court maintained the permanency plan as reunification.

[13] In February 2016, Father began counseling sessions with Corinna Davies, a therapist at CMHC, to work on relational dynamics within the family. Father attended a total of three sessions and was "resistant" to counseling. (Tr. at 103.) During his limited treatment, Davies diagnosed Father with Narcissistic Personality Disorder. Davies requested Father continue to schedule counseling appointments with her, but Father failed to do so and did not return to counseling after the first three sessions.

[14] The court held a periodic review hearing on February 25, 2016. DCS reported Father was required to undergo drug screenings at least once a week, but since the most recent review hearing in December 2016, Father had undergone only three drug screenings. Father tested negative at each. DCS also reported Father had visited Child only twice since the last hearing and, although Father was aware Child had undergone surgery, Father did not visit Child while he was in the hospital. Mother had been required to undergo drug screening twice a week, but since the last review hearing in December, Mother had undergone only five total drug screenings. DCS requested the permanency plan be changed from reunification to adoption, and it requested permission to file a petition to terminate parental rights. On March 4, 2016, the court granted DCS permission to file a petition to terminate Parents' parental rights to Child. On March 11, 2016, DCS filed its Verified Petition for Termination of Parents' Parental Rights.

[15] On June 1 and June 23, 2016, the trial court held fact-finding hearings on DCS's petition. The court heard testimony from DCS Family Case Manager Steve Cruse, CMHC Case Manager Tres Lynette, Davies, Child's foster parent, and Father. Lynette, who observed the majority of supervised visitations between Parents and Child, testified that, from the beginning of the case until roughly the end of July 2015, Father brought diapers, wipes, food, shoes, and "whatever else was needed" for Child to visits, but that Father's effort tapered throughout the case. (Tr. at 121.) Specifically, Father stopped providing diapers and wipes after the court ordered Father to pay child support to Child's

foster parent. Lynette described Father's interaction with Child as "minimal," (*id.* at 122), and noted "[a]t times it was hard for him to sit in a room with [Child] for two hours. He attended to his phone, he cut visits short, sitting on a couch rolling a ball back and forth with his foot while playing on the phone." (*Id*. at 123.) Although Child was roughly two and a half years old, Child was functioning at the level of a six-month old and had trouble expressing himself. One method Child used to communicate was signing. Lynette testified Father was not aware of the sign language, Lynette typically had to "translate," (*id.* at 127), and Father made little effort to learn how to communicate with Child. Lynette further testified she recommended Father begin working with her individually on "building coping skills [and] helping [Father] understand the importance of positive communication and expressive language," but Father declined those services. (*Id*. at 113-14.) Lynette testified Father's attendance for visits declined throughout the case and Father told her "he knows they have not made progress[,] that if anything they've gone backwards." (*Id*. at 129.)

[16] On June 23, 2016, Mother admitted the allegations in the petition to terminate her parental rights and voluntarily relinquished her parental rights. On July 11, 2016, the court terminated Father's parental rights.

# Discussion and Decision

[17] "The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied*. To terminate a parent's

rights, the State must file a petition in accordance with Indiana Code Section 31-35-2-4 and then prove the allegations therein by clear and convincing evidence. *Id.* at 1260-61. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8; *In re N.G.,* 51 N.E.3d 1167, 1170 (Ind. 2016).

[18]    A petition to terminate the parent-child relationship must allege:

(A) that one (1) of the following is true:

(i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The trial court must enter findings of fact to support each of its conclusions as to those allegations. Ind. Code § 31-35-2-8(c).

[19] We review termination of parental rights with great deference. *In re K.S., D.S., & B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* We apply a two-tiered standard of review: we determine first whether the evidence clearly and convincingly supports the findings, and second whether the findings clearly and convincingly support the conclusions. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). However, where a party challenges the judgment but does not challenge the findings of fact as unsupported by the evidence, we look only to the findings to determine whether they support the judgment. *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000). We will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied, trans. denied, cert. denied* 534 U.S. 1161 (2002).

[20] Father concedes the State proved subsections (A), (C), and (D) of Indiana Code Section 31-35-2-4(b)(2). He challenges only the court's conclusion under subsection (B) that there was a reasonable probability the conditions that resulted in Child's removal will not be remedied.

[21] The condition that resulted in Child's removal from the home was neglect due to domestic violence occurring in the home in the presence of Child. Father argues "th[e] issue was remedied as Mother was no longer living in the home." (Appellant's Br. at 21.) He claims he had "no criminal history" and "Mother's drug abuse caused the conflict in the home and that issue was resolved with Mother no longer living in the home." (*Id.*) We disagree.

[22] As the trial court found, Father was arrested on July 15, 2015, and charged with strangulation and domestic battery against Mother. As a result of these charges, the court ordered Father to have no contact with Mother. During this time, Mother was not living with Father, but was staying with a friend and looking for a place to live. The trial court further noted Father was subsequently arrested in August 2015 for violating the no-contact order when he was driving with Mother. Thus, while Father argues "Mother's drug abuse caused the conflict in the home" and that issue was "resolved with Mother no longer living in the home," the court's findings show that Mother's living in the home was not the root of Father's issues. (*Id.*) Father still committed strangulation and battery and subsequently violated the court's protective order while this CHINS case was proceeding and Mother was no longer living in his home.

[23] In addition, the court's findings demonstrate that Father failed to take any substantial steps towards improving his relational skills. The court first ordered Father to seek counseling in its dispositional decree entered June 10, 2015. The court again ordered Father to seek counseling after the strangulation and battery charges in July 2015. Father failed to seek counseling until February 2016, when he finally met with Davies at CMHC. Even then, Father gave up on attending after only three sessions. Furthermore, in the limited time Davies interacted with Father, she diagnosed Father with Narcissistic Personality Disorder. At the termination hearing, Davies testified Father "wasn't apt to own up to . . . his part in what had occurred, what actions had led up to Child's removal." (Tr. at 104.) In addition, Father declined services recommended by Lynette to work on improving his communication and relationship with Child.

[24] Father also points to his ability to maintain gainful employment, income, and a household as evidence of his parental fitness. However, Child was not removed from Father's care based on his inability to maintain a home, but because of the domestic violence and neglect that occurred in the home. In concluding there was a reasonable probability the conditions which resulted in Child's removal would not be remedied, the trial court cited Father's refusal to successfully complete any counseling or engage meaningfully with Child. In light of these findings, Father's ability to maintain a house and income cannot, on its own, serve as a basis for reversal. *See In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008) ("[I]f the evidence and inferences support the trial court's decision, we must affirm."), *trans. denied*.

Even on appeal, Father takes no responsibility for his actions leading to the termination of his parental rights. He does not challenge the court's findings that he made no progress after this case was opened and even "admitted no progress has been made." (App. Vol. II at 24.) Instead, Father's arguments essentially amount to blaming Mother for the events that lead to Child's removal from his care and the subsequent termination of his parental rights. In terminating Father's parental rights, the trial court specifically noted it considered "Father's lack of cooperation, his history of and continuing acts of violence and lack of effort and progress in communication and connecting with the child." (*Id.* at 27.) Based on the court's unchallenged findings, we cannot say the court erred in concluding there was a reasonable probability the conditions would not be remedied, as required under Indiana Code section 31-35-2-4(b)(2)(B)(i).[4]

# Conclusion

---

[4]Because our legislature wrote subsection (B) in the disjunctive, a trial court needs to find only one of the three requirements established by clear and convincing evidence before terminating parental rights. *In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002). Nevertheless, we note the trial court found there was a reasonable probability under subsection (B)(i) the conditions that resulted in Child's removal or continued placement outside the home would not be remedied by Father *and* under subsection (B)(ii) the continuation of the parent-child relationship poses a threat to the well-being of Child. (App. Vol. II at 27.) Father challenges both conclusions. Because there is sufficient evidence the conditions under which Child was removed would not be remedied under (B)(i), we need not address the court's conclusion under (B)(ii).

The trial court's unchallenged findings support its conclusions. Accordingly, we affirm its decision to terminate Father's parental rights.

Affirmed.

Najam, J., and Bailey, J., concur.