## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 16 2016, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of M.J.P. & M.L.P. (Children) and S.M. (Mother);

S.M. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 16, 2016

Court of Appeals Case No.
79A05-1605-JT-959

Appeal from the Tippecanoe Superior Court

The Honorable Thomas K. Milligan, Senior Judge

Trial Court Cause No.
79D03-1510-JT-82
79D03-1510-JT-83

**May, Judge.**

S.M. ("Mother") appeals the involuntary termination of her parental rights to her two children, M.J.P. and M.L.P. (collectively, "Children"). Mother raises three issues, two of which are dispositive:

> (1) whether the court's findings of fact support the court's conclusion of law that there was a reasonable probability the conditions resulting in Children's removal or reasons for placement outside Mother's home would not be remedied; and
>
> (2) whether the court's findings of fact support the court's conclusion of law that termination was in Children's best interest.

We affirm.

# Facts and Procedural History

M.J.P. was born to Mother and J.P. ("Father") on March 20, 2004, and M.L.P was born to Mother and Father on November 23, 2005. Father has been in and out of prison for various drug convictions, and has had only a small role in Children's lives.[1] Mother and Father divorced in 2009, and Mother married T.M. in 2010. T.M. never had parental rights to Children, but Children considered T.M. their father because he had a larger role in their lives than

---

[1] Father failed to appear for the majority of the CHINS and termination proceedings or to comply with any of the trial court's orders resulting therefrom. He does not participate in this appeal. As such, we omit facts pertinent to Father in this opinion.

Father.  In March 2014, Mother and T.M. separated.  Mother then began dating B.S. ("Boyfriend") and, in April 2014, moved in with him.

[3]     On June 9, 2014, DCS received a report that police found Mother and Boyfriend under the influence of heroin in their home with Children present.  DCS took Children into protective custody on an emergency basis.  On June 11, 2014, DCS filed a petition alleging Children were Children in Need of Services ("CHINS") based on Mother's illegal drug use.  The court granted temporary custody of Children to the State.  Children were initially placed in their maternal great grandmother's care, but were moved to the care of their maternal grandfather ("Maternal Grandfather") and his girlfriend shortly thereafter.  On July 30, 2014, the court held a fact finding hearing and adjudicated Children CHINS.  At that time, Children remained in Maternal Grandfather's care.

[4]     On August 27, 2014, the court held a dispositional hearing.  Following the hearing, the court entered a disposition order for Children to be made wards of the State, remain in their current care placement with Maternal Grandfather, and participate in mental health assessments.  The court also entered a parental participation decree that ordered Mother to participate in services including substance abuse treatment, home-based case management, drug screens, and supervised visitation with Children.

[5]     Throughout October and November 2014, Mother participated in intensive outpatient substance abuse programs ("IOP") at Wabash Valley Alliance

("Wabash") and Home-Based/Goal Focused Services for Children and Families ("HGCF"). However, both Wabash and HGCF reported Mother often cancelled, missed sessions without notice or reason, and slept through group therapy sessions. Mother and Children were participating in supervised visitations at DCS offices during this time.

[6] On November 19, 2014, DCS family case manager Andrea Allen ("FCM Allen") made separate, unannounced visits to M.J.P. and M.L.P.'s respective schools. After meeting with them, FCM Allen reported both children became tearful and expressed concern about Mother's drug use and her relationship with Boyfriend. FCM Allen also noted M.L.P. was behind in school, but M.J.P. was doing well in school.

[7] On November 24, 2014, the court held a permanency review hearing. The court noted Mother did not have independent housing and was relying on family and friends. It found Children's current placement with Maternal Grandfather was still in Children's best interest but that "there [was] still a probability of success" in attaining the objective of its dispositional decree, which was reunification. (Ex. Vol. 1 at 37.)[2] The court ordered Mother to continue participating in services, remain drug and alcohol free, and undergo all

[2]The trial court clerk's failure to number the pages of the Exhibit volumes greatly hindered our review of the record. We cite the page numbers as they appear consecutively in the PDF format of the Electronic Record. *See* Ind. Appellate Rule 29(A) (requiring the Exhibits be filed in accordance with Appendix A(2)(a), which provides: "Each volume of the Transcript shall be independently and consecutively numbered at the bottom. Each volume shall begin with numeral one on its front page.").

random drug screens requested by DCS or service providers. Mother's visitation with Children was suspended until Mother submitted urine screens that did not indicate use of methamphetamine.

[8] Mother was unsuccessfully discharged from both Wabash and HGCF at the beginning of December 2014 for failure to comply with the programs. On December 3, 2014, DCS requested a show cause hearing due to Mother's noncompliance with therapy and her continued methamphetamine use. On January 14, 2015, the court held a hearing. The court noted Mother tested positive for methamphetamine and amphetamine on November 18, 2014. Mother admitted using illegal drugs, failing to participate in services, and being discharged from services. The court found Mother in contempt for failing to remain drug and alcohol free and failing to submit random drug screens as required by the parental participation decree. Mother reported to Tippecanoe County Jail. The court ordered the hearing to be continued on February 23, 2015.

[9] Sometime in late December 2014 or early January 2015, T.M. indicated he wanted to be the relative placement for Children. DCS visited Children at T.M.'s home in January 2015. Children appeared to be "comfortable and happy" and indicated that they would like to live with T.M. (*Id*. at 130.) Children were removed from Maternal Grandfather's care in January 2015 and placed with T.M. However, later that month, T.M. was in a car accident and arrested for driving under the influence of alcohol. M.J.P. was in the car with

T.M. at the time of the accident, and as a result, Children were removed from T.M.'s care and placed in a licensed foster home.

[10] Following a motion by DCS, the court held the continued show cause hearing on February 2, 2015, instead of February 23, 2015. The court noted Mother was nineteen weeks pregnant with Boyfriend's child and continued to use methamphetamine and other drugs, as evidenced by a drug screen on January 20, 2015. The court further noted Mother was hospitalized due to a blood infection and subsequently left the hospital against medical advice. The court ordered Mother to remain in the Tippecanoe County Jail until she could be admitted to the Maternal Fetal Medicine Unit in Indianapolis.

[11] On February 6, 2015, the court, on its own motion, released Mother from the Tippecanoe County Jail on her own recognizance while she awaited a vacancy at the Maternal Fetal Medicine Unit. The court ordered the Tippecanoe County Sheriff to transport Mother to the North Central Indiana YWCA's "Breaking Free" Dual Treatment program in South Bend, Indiana. Mother began the inpatient dual treatment substance abuse and domestic violence program on February 9, 2015, and completed it on April 2, 2015. After being released from the program, Mother participated in outpatient substance abuse services and consistently provided clean drug screens. As a result of Mother's progress, DCS resumed supervised visitation between Mother and Children in April 2015.

[12] On June 6, 2015, Mother gave birth to Z.S. Because Mother had been making substantial progress in services and visitation, and was remaining drug and alcohol free, DCS did not remove Z.S. from Mother's care. Furthermore, Mother agreed to a safety plan requiring her to keep Z.S. away from Boyfriend. DCS continued regular home-based case management and therapy services with Mother after Z.S. was born.

[13] On the evening of June 27, 2015, Mother was caring for Z.S. while cleaning out her recently deceased mother's home. Mother arranged for a friend to babysit Z.S., and then Mother met an acquaintance at a gas station to purchase heroin. Mother then returned to Boyfriend's house where she overdosed.[3] Boyfriend drove Mother to the emergency room, and she was hospitalized. When Mother awoke in the hospital, she learned Z.S. had been left in Boyfriend's care in violation of the court-ordered safety plan. The next day, while Mother was still in the hospital, Z.S. died in Boyfriend's care because Boyfriend was under the influence of heroin and fell asleep next to Z.S., causing the infant to suffocate.

[14] Immediately following Z.S.'s death, DCS moved for the court to suspend Mother's visitation with Children due to Mother's relapse and the subsequent death of Z.S. On June 29, 2015, the court held a hearing on DCS's motion and suspended visitation. DCS attempted to coordinate services for Mother to help

[3] The record contains multiple, conflicting accounts of the night Mother relapsed. The facts here reflect Mother's February 4, 2016, testimony of the incident.

her process the death of Z.S. Mother initially participated, but completely stopped attending any services in July 2015.

[15] Mother moved to reinstate her visitation with Children on July 27, 2015. On August 19, 2015 the court held a visitation and permanency review hearing. Paul Stamm, Children's therapist, testified at the hearing and recommended "visitations re-commence at a therapeutically supervised level in approximately one to two months." (Ex. Vol. 1 at 81-82.) He stated Children were presently "very angry and depressed over the death of their sibling, over Mother's continued drug use[,] and [over] her ongoing relationship with [Boyfriend]." (*Id.*) Mr. Stamm noted Children blamed Mother for Z.S.'s death and were living "in fear of [Boyfriend.]" (*Id.*) The court noted Mother was living with Boyfriend at T.M.'s home, admitted using methamphetamine seven days before the hearing, refused to undergo a drug screening on July 8, 2015, and was not participating in any therapeutic services. The court ordered Mother could resume therapeutic visitation on October 1, 2015, pending three clean drug screens. The court set a permanency review hearing for October 21, 2015.

[16] On October 21, 2015, DCS filed its Verified Petition for Termination of Parental Rights. The trial court held fact finding hearings on DCS's petition on January 13, 2016, and February 4, 2016. On January 13, 2016, the court heard testimony from M.J.P., case workers, Mother, and Father. DCS case manager Sally Messmer testified that "the parents have had ample time to work towards that goal of reunification and [M.J.P.] and [M.L.P.] need permanency, they need a final decision and [to] start working towards their forever home." (Tr.

Vol. 2 at 279.) Additionally, M.J.P. testified "that [she] [did not] want to go back with [her] mother." (Tr. Vol. 1 at 82.) On February 4, 2016, Mother testified she had been sober since Christmas of 2015, and had started her own housecleaning business, but was still living with Boyfriend. She admitted the last time she had undergone a drug screening was prior to Z.S.'s death in June 2015 and the last time she went to therapy was July 2015. As of the date of the final termination hearing, Children had not seen Mother since July 2015.

[17] On April 8, 2016, the court terminated the parental rights of Mother and Father. The court concluded there was a reasonable probability the conditions resulting in Children's removal or reasons for continued placement outside the home would not be remedied, the continuation of a parent-child relationship posed a threat to the well-being of Children, termination was in Children's best interests, and DCS had a satisfactory plan of adoption for the care and treatment of Children following termination of parental rights.

# Discussion and Decision

[18] "The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied*. To terminate a parent's rights, the State must file a petition in accordance with Indiana Code § 31-35-2-4 and then prove the allegations therein by clear and convincing evidence. *Id.* at 1260-61. If the court finds the allegations in the petition are true, it must

terminate the parent-child relationship. Ind. Code § 31-35-2-8; *In re N.G.,* 51 N.E.3d 1167, 1170 (Ind. 2016).

[19] In relevant part, a petition to terminate the parent-child relationship must allege:

> (B) that one (1) of the following is true:
>
>> (i)　　There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)　　There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii)　　The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Because our legislature wrote subsection (B) in the disjunctive, a trial court needs to find only one of the three requirements established by clear and convincing evidence before terminating parental rights. *In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002). The trial court must enter findings of fact to support each of its conclusions as to those allegations. Ind. Code § 31-35-2-8(c).

[20] We review termination of parental rights with great deference. *In re K.S., D.S., & B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh

evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* We apply a two-tiered standard of review: we determine first whether the evidence clearly and convincingly supports the findings, and second whether the findings clearly and convincingly support the conclusions. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). However, where a party challenges the judgment but does not challenge the findings of fact as unsupported by the evidence, we look only to the findings to determine whether they support the judgment. *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000). We will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d at 208.

### 1. *Reasonable Probability Conditions Not Remedied*

[21] Mother asserts the trial court erred in concluding there was a reasonable probability the conditions that resulted in Children's removal or remaining out of the home would not be remedied. We disagree with Mother.

[22] The condition that resulted in Children's removal from Mother's home was Mother's heroin use with Boyfriend while Children were in their care. The trial court concluded "in spite of the services provided by DCS and in spite of efforts made to reunify the children," there was a reasonable probability the conditions that resulted in removal of Children or reasons for continued placement outside the home would not be remedied. (App. Vol. II at 21.) In support of this conclusion, the trial court found:

DCS made efforts to address the issues that gave rise to Children's removal. Mother failed to follow the recommendations from her mental health assessment and substance abuse assessment. Mother has not completed IOP, has cooperated with taking drug screens from time to time, failed to meet case management goals and has not attended therapy since July 2015.

(*Id*. at 17.) The trial court pointed out "the progress of this case really occurred between February of 2015 and July of 2015[,]" but at the time of the termination hearing, Mother had not attended therapy or seen Children since July 2015. (*Id*.) Furthermore, the court noted at the time of the termination hearing, Mother was still residing with Boyfriend, "who [was] known to be a chronic drug user and abuser[,]" (*id*.), and Mother "remain[ed] at risk for relapse and use because of her continued association with him." (*Id.)*

[23] Mother does not challenge any of these findings, but argues, "[w]ith more time and work, Mother can remedy the conditions resulting in the removal of her children from her care." (Appellant's Br. at 22.) She also claims that, while she is still in a relationship with Boyfriend, "she would end that [relationship] if her children were to be in her care." (*Id.* at 21.) While we acknowledge Mother's good intentions, her intentions cannot serve as a basis for reversal. *See In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008) ("[I]f the evidence and inferences support the trial court's decision, we must affirm."), *trans. denied*.

[24] Additionally, as the trial court found, Mother "had a couple of efforts at completing IOP," but failed to successfully complete any of the IOP programs,

and failed multiple drug tests throughout the case. (App. Vol. II at 17.) Based on the court's unchallenged findings, we cannot say the court erred in concluding there was a reasonable probability the conditions would not be remedied as required under Indiana Code § 31-35-2-4(b)(2)(B)(i).[4]

## 2. *Best Interests of Children*

[25] Mother asserts the court erred in concluding termination of the parent-child relationship was in the best interests of Children. We first note that deciding whether termination of parental rights is in the children's best interests is one of the most difficult determinations because it "places the children's interests in preserving the family into conflict with their need for permanency." *In re E.M.*, 4 N.E.3d 636, 647 (Ind. 2014). The State must make reasonable efforts "to preserve and reunify families," Ind. Code § 31-34-21-5.5(b), because it promotes "not just parents' fundamental liberty interest in raising their own children . . . but also the children's best interests." *In re E.M.,* 4 N.E.3d at 647. However, "children also have a paramount need for permanency," which is a "central consideration in determining children's best interests." *Id.* at 647-648.

[26] The trial court made a number of findings to support its conclusion that termination of the parent-child relationship was in Children's best interests.

---

[4] Mother also argues DCS did not present sufficient evidence the continuation of the parent-child relationship posed a threat to the well-being of Children. However, as DCS presented sufficient evidence the conditions under which Children were removed would not be remedied, we need not address that argument. *See In re L.S.*, 717 N.E.2d at 209 (because statute written in disjunctive, court needs to find only one requirement to terminate parental rights).

The trial court noted Mother's relapse in June 2015 and the events that followed. Specifically, the trial court found "Mother used heroin and [as] a result of that use knew she could not care for [Z.S.] and handed him off to a friend[.]" (App. Vol. II at 18.) The court noted Z.S. ended up in the care of Boyfriend, which resulted in Z.S.'s death. The trial court also found:

> 21. The children worked in therapy regarding issues and boundaries, the reason for DCS involvement, the death of a sibling, lack of parental involvement, instability and abuse due to parental substance use, and issues surrounding permanency. Those issues are more than any child should have to deal with. Each of those [is] a traumatic event and then to have them stacked one on top of the other is nearly impossible for a child to deal with. The children have worked with their therapist and have improved to the point to where [M.J.P.] wanted to be able to testify in Court, to have her say and confront her parents regarding her anxiety, anger, and fear. The children, as mentioned above, have suffered physical and emotional trauma that have resulted in fear of their Mother, Father, and [Boyfriend]. They are aware that [Boyfriend] has continued using drugs and believe that Mother is still using drugs. [M.J.P.], in particular, is keenly aware of her Mother's continued poor choices. There has been no contact between Mother and the children since the end of July 2015. Mother continues to be dependent due to relapse and substance issues. Also Mother continues to make poor choices with men as evidenced by continuing to reside with [Boyfriend], who is ultimately responsible for their sibling's death. There is also a history of domestic violence that neither parent has addressed during the course of this case. The result is that the children are obviously conflicted because they love their Mother but don't feel they can trust her.

22. . . . The DCS testament [sic] is that if parents were to start now and work diligent[ly] in pursuant [sic] of their services and do everything they were supposed to do, that it would be at least six (6) months to a year before they could be in a position to parent these children. The children do not want to return to their parents, are old enough and knowledgeable enough to know what happened, but they just don't understand why. CASA reports that based on the history of abuse and neglect in this case, there is no reason for these children to wait to find a loving and caring family where they can have a life that does not mirror their Mother's or their Father's.

(*Id.* at 21.)

[27] These findings support the court's conclusion that termination was in Children's best interests. While Mother claims on appeal that she would end her relationship with Boyfriend if Children were to be in her care, there is nothing in the record to support her claim. Nor is there anything to support Mother's overall argument that she has potential to be a good mother. In contrast, the record is replete with evidence showing Mother's inability to complete the steps necessary for reunification with her children. "[C]hildren cannot wait indefinitely for parents to work toward preservation or reunification – and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship.'" *In re E.M.*, 4 N.E.3d at 648. We cannot say the trial court erred in concluding that termination is in Children's best interests.

# Conclusion

The trial court's unchallenged findings support its conclusions. Accordingly, we affirm its decision to terminate Mother's parental rights.

Affirmed.

Kirsch, J., and Crone, J., concur.