## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 25 2019, 9:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Carlos I. Carrillo
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: S.R.W., Minor Child,

S.D., Father, and A.W., Mother,

*Appellants-Respondents*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

July 25, 2019

Court of Appeals Case No.
19A-JT-367

Appeal from the Johnson Circuit Court

The Honorable Andrew S. Roesener

Trial Court Cause No.
41C01-1809-JT-60

**Brown, Judge.**

[1] S.D. ("Father") and A.W. ("Mother" and, together with Father, "Parents") appeal the involuntary termination of their parental rights with respect to S.R.W. We affirm.

*Facts and Procedural History*

[2] On January 22, 2018, S.R.W. was born and tested positive for methamphetamine. Parents tested positive for methamphetamine on the same day, and two days later S.R.W. was released to, and later placed in the care of, Father's paternal cousin and her husband. On January 25, 2018, the Indiana Department of Child Services ("DCS") filed a petition alleging S.R.W. was a child in need of services ("CHINS"), that a pipe, resembling a crack/meth pipe, was present in Parents' motel room, and that Parents tested positive for methamphetamine and amphetamine in drug screens administered on January 22, 2018.

[3] On February 20, 2018, Parents acknowledged that S.R.W. was a CHINS and the court issued an agreed order on facilitation which stated that Parents agreed to certain dispositional goals, including maintaining appropriate housing that was safe, clean, and free of any illegal drugs, drug activity, alcohol, or individuals under the influence; not using, consuming, or distributing any controlled substances; submitting to substance abuse assessments and following all recommendations; submitting to random drug screens; obeying the law and, if arrested, notifying DCS within five days of the arrest; participating in home-based case management; demonstrating an ability to meet S.R.W.'s physical and age-appropriate supervisory needs including the provision of appropriate

clothing, diapers, and food during parenting time; and demonstrating the ability to meet his medical and mental health needs.

[4]     On October 1, 2018, DCS filed a petition to terminate Parents' parental rights. On January 18, 2019, the court held a termination hearing at which it heard the testimony of Parents, the director of the court-appointed special advocate ("CASA") program, Father's cousin, Father's probation officer, a home-based care manager, two caseworkers, the women's program coordinator for the TARA treatment center, the counselor who completed Mother's initial assessment, and a DCS family case manager. Mother answered positively when asked if she made an admission on February 20th that S.R.W. was a CHINS due to "your substance abuse issues needing to be addressed." Transcript Volume II at 7. When Father was asked if he made the same joint admission, he stated that he "sure did, under duress." *Id.* at 12. Mother indicated S.R.W. had been involved with DCS since he was born, her last positive screen was in September, and since she left rehab she had relapsed for a day on December 15th. Father answered affirmatively when asked if he had a job "lined up," testified that he would start at Allied Reliability Group, "which is a contract-to-hire for Roche," on January 28th, and stated that he would make $29.17 an hour, which "absolutely would" be sufficient to provide for his family's needs. *Id.* at 112-113. He indicated he had completed treatment back in April or May 2018 and that he had made an admission to his probation officer that he used methamphetamine on December 15th.

When asked if she believed termination was in S.R.W.'s interests, CASA director Tammi Hickman ("CASA Hickman") answered "[a]t this time, yes," and stated, "round two, we've been here before," that she thought Parents had been given adequate time to address their needs, and "[w]e haven't seen a great improvement." *Id.* at 19. DCS family case manager Kelsie Ferguson ("FCM Ferguson") testified that she made substance abuse assessment referrals for Father to Salvation Army and "two to Adult and Child, one on October 10th and one recently on January 2nd" and indicated that he did not comply with any of the assessments. *Id.* at 77. She testified that she thought termination of the parent-child relationship was in S.R.W.'s best interests because she did not believe that Parents can keep him safe, that they are unable to meet his needs, they struggle with addiction that is not being addressed, they are currently homeless, and S.R.W. has medical needs. The court admitted Parents' drug screen results as Petitioner's Exhibits 8-13.

On the same day, the court terminated Parents' parental rights in a twenty-two page order. The court found that Mother and Father each have other children besides S.R.W., Mother's other children are not presently in her care, Father has four other children, none of whom are presently in his care, and that he was convicted of child molestation in 2003 related to one of his four children. The order states that Parents' child, I., was born on March 8, 2015, and that Parents, who were living in a garage belonging to I.'s paternal grandparents at the time of I.'s birth, were ordered to leave because Mother stole a debit card belonging to I.'s paternal grandfather. It indicates that a CHINS action was

filed regarding I., during which time period Parents used methamphetamine, were unable to maintain suitable housing, and were both incarcerated, and that Parents' parental rights were terminated on February 16, 2017, "premised largely on their inability to obtain and maintain housing; serial drug abuse; and overall lack of participation in dispositional services." Appellants' Appendix Volume II at 43.

[7] The order states that Parents were homeless when they admitted that S.R.W. was a CHINS and that dispositional services and programming were directed toward the accomplishment of two principal goals: "[o]btaining and maintaining appropriate housing" and "[l]iving a life free from addiction to illicit drugs." *Id.* at 43-44. It states that Parents did not satisfy the rent obligation of an apartment they had briefly obtained and were evicted in July 2018, that during the pendency of the underlying CHINS matter, Parents have resided in a tent and an abandoned barn among other locations, and that they were presently homeless and "each conceded at the trial of this matter that their present living situation is not proper" for S.R.W. *Id.* at 50.

[8] Regarding Father's substance abuse, the court found that he successfully completed an assessment on January 29, 2018, was ordered to complete a substance abuse curriculum through the "Living in Balance" program and completed it on April 30, 2018, and relapsed following completion of the program and returned to the serial abuse of illicit drugs during the months of May and June 2018, a period during which he tested positive for methamphetamine in eight instances and was not engaged in any substance

abuse treatment program. *Id.* at 44. The order states that subsequent to his relapse in May and June 2018, DCS issued three separate referrals for new substance abuse assessments: to the Salvation Army on September 18, 2018, and to Adult and Child on September 10, 2018, and on January 2, 2019; that he failed to complete any of these assessments; and that, in addition, DCS made approximately four referrals for residential treatment and four referrals for outpatient treatment in which he failed to engage. It indicates he failed to engage in any referred residential or outpatient treatment programs and has never meaningfully engaged in treatment following his relapse in May and June 2018. It further indicates that Father was arrested for failure to register as a convicted sex offender in fall 2018, convicted for failure to register as a sex or violent offender as a level 6 felony pursuant to a plea agreement, and sentenced to three hundred and sixty-five days with thirty-two days executed and the remainder suspended to probation. The court found that Father's probation officer conducted a home visit of his residence in an abandoned barn on December 18, 2018, that the probation officer witnessed evidence of drug use and found two syringes in the barn, and that he admitted to the probation officer that he used methamphetamine on December 15, 2018.

[9]     Regarding Mother's substance abuse, the court found that she participated in an evaluation on January 29, 2018, and failed to follow its treatment recommendations. The order states that she abstained from the use of illegal drugs for several months at the inception of the related CHINS matter but relapsed, began using methamphetamine during May and June 2018, and tested

positive for methamphetamine in seven instances during those months. It states that DCS made nine separate referrals for substance abuse treatment and she failed to complete any, often displaying a recalcitrant and defiant attitude toward treatment and treatment providers. It details an incident in spring 2018 during a parenting time session in which Mother "asked the parenting time supervisor if it was okay to be 'high' during the visit" and another incident in fall 2018 in which Mother was admitted to the TARA Treatment Center, left against advice, returned a month later, and disclosed that she had used heroin that day. *Id.* at 49. After completing detoxification, Mother returned to commence residential services and left on foot and against advice a week later. The court found Mother displayed a poor attitude and lack of commitment while she was at the treatment center and that she acknowledged using methamphetamine as recently as December 15, 2018.

[10] The order details an incident in late summer or early fall 2018 in which Parents were asked to leave a bakery because Mother was caught attempting to steal merchandise and stated that she was charged with theft as a level 6 felony on August 2, 2018, "but it does not appear the charge is related to" the bakery incident. *Id.* at 49. It indicates that Father obtained new employment through a temporary agency, that he was "placed at 'Roche,'" and that "[i]t is uncertain whether the position at 'Roche' is temporary or permanent." *Id.* at 50. It states that S.R.W., who has a number of consequential health conditions that require vigilant care and attention, remained in the uninterrupted care of Father's cousin and her husband, and that they have demonstrated a willingness to not

only ensure the correct medical providers are involved in S.R.W.'s care, but have also implemented those measures recommended by providers in their home to ensure his safety and development. It indicates that Father's cousin and her husband are the adoptive parents of I., with whom S.R.W. is closely bonded, and that I. and S.R.W. share a half hour to an hour of play time each morning before the other children in the house awaken. It further indicates that the court took notice of a case in which Father's cousin and her husband filed for the adoption of S.R.W., and found that CASA supports the termination of Parents' parental rights and S.R.W.'s adoption and that DCS supports termination as well.

[11]    In its "Conclusions of Law", the court concluded that Parents have been using methamphetamine for nearly four years and both continue to use methamphetamine as recently as the last month, the record is replete with evidence demonstrating DCS's commitment to assist Parents in addressing their addiction, and that neither Mother nor Father is any closer to completing necessary drug treatment. The order states that Parents continue to be contumacious as it relates to both drug treatment and their view of DCS, demonstrate a lack of insight into their own problems, and consistently exercise poor judgment in innumerable facets of their lives. It states that Parents fail to see the connection between their drug addiction and their homelessness, continue to be homeless and concede that this fact itself is a bar to immediate reunification with S.R.W., and that Parents' drug addictions and homelessness can necessarily be said to be habitual at this point. The court further found that

S.R.W. is well cared for and loved by Father's cousin, her husband, and I., their home is the only home he has known, and his best interest is served by terminating Parents' parental rights and allowing the adoption to proceed.

### *Discussion*

[12]    The issue is whether sufficient evidence supports the termination of Parents' parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). The State's burden of proof for establishing allegations in termination cases "is one of 'clear and convincing

evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id.* We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.* Reviewing whether the evidence "clearly and convincingly" supports the findings, or the findings "clearly and convincingly" support the judgment, is not a license to reweigh the evidence. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[13] We note that Parents do not challenge the trial court's specific findings. Further, they do not specifically argue that a reasonable probability that the conditions which resulted in S.R.W.'s removal or placement outside the home will not be remedied or a reasonable probability that the continuation of the parent-child relationship poses a threat to his well-being do not exist. Rather, they phrase their argument as whether the "evidence was insufficient to

establish by clear and convincing evidence that it was in the child's best interest to terminate [Parents'] parental rights." Appellant's Brief at 17; *accord id.* at 15, 18, 21. They contend that they abstained from drugs and participated in most drug screens for significant periods of time and they passed the majority of their screens; they had an apartment at a point before they were evicted due to an inability to pay rent; Father was starting a full-time job with his first day only ten days after the termination hearing; and they participated in parenting time and actively participated in home-based case management services.

[14] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification, and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be

remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[15]  Our review of the evidence reveals that DCS has been involved with S.R.W. since his birth. He was adjudicated a CHINS on February 20, 2018, due to Parents' substance abuse and pursuant to an agreed order. Subsequent to agreeing to certain dispositional goals, Mother tested positive for methamphetamine, as did Father after he had completed treatment for substance abuse. Father did not comply with or engage in three separate substance abuse assessment referrals – the last occurring in January 2019 – and, as the order finds, approximately four referrals for residential treatment and four referrals for outpatient treatment. At the January 18, 2018 termination hearing, Mother and Father both admitted to using methamphetamine on December 15, 2018. Although Father had indicated that he obtained new employment which he had not yet started, he testified that the position was contract-to-hire and the court noted the employment was through a temporary agency and found it uncertain whether the position was permanent. CASA Hickman indicated she believed termination was in S.R.W.'s best interests at the time and testified that Parents received adequate time to address their needs but to no great improvement. FCM Ferguson testified she thought termination was in S.R.W.'s best interests because she did not believe that Parents can keep him safe, that they are unable to meet his needs, they struggle with addiction that is not being addressed, they are currently homeless, and S.R.W. has

medical needs. To the extent Parents argue that they abstained from drugs for significant periods of time, passed the majority of their screens, and had an apartment at some point, this is a reweighing of the evidence, which this Court will not do. *See In re E.M.*, 4 N.E.3d at 640.

[16] Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of S.R.W. is supported by clear and convincing evidence. We find no error and affirm the trial court's termination of Parents' parental rights.

[17] Affirmed.

May, J., and Mathias, J., concur.