## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 18 2020, 9:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark F. James
Anderson, Agostino & Keller P.C.
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of K.J.V. (Minor Child), and | August 18, 2020 |
| Z.T. (Mother), | Court of Appeals Case No. 20A-JT-366 |
| *Appellant-Respondent*, | Appeal from the St. Joseph Probate Court |
| v. | The Honorable Jason A. Cichowicz, Judge |
| Indiana Department of Child Services, | The Honorable Ashley Mills Colburn, Magistrate |
| *Appellee-Petitioner*. | Trial Court Cause No. 71J01-1909-JT-121 |

**Brown, Judge.**

[1]     Z.T. ("Mother") appeals the involuntary termination of her parental rights to her child, K.J.V.  We affirm.

### Facts and Procedural History

[2]     On October 16, 2009, K.J.V. was born to Mother and J.P.V. ("Father").[1]  In 2010, a guardianship was filed in which Mother's sister was given guardianship of K.J.V. for a few months, and K.J.V. was ultimately returned to Mother.

[3]     In 2011, the Department of Child Services ("DCS") filed a petition under cause number 71J01-1105-JC-124 alleging K.J.V. was a child in need of services ("CHINS"), K.J.V. was failing to thrive, Mother had admitted to dosing the child with Benadryl in her baby bottle on a regular basis, Mother appeared to hospital staff to be under the influence of drugs or alcohol, and hospital staff believed she could not care for the child.  On February 1, 2012, K.J.V. was adjudicated to be a CHINS.  K.J.V. was returned home on March 21, 2012.  On September 10, 2012, the trial court entered an Order Terminating Jurisdiction.

[4]     On April 4, 2014, Mother's sister, E.B., was appointed as guardian under cause number 71J01-1308-GU-151 ("Cause No. 151").[2]  On December 27, 2017, DCS filed a petition alleging K.J.V. was a CHINS.  Specifically, it alleged that E.B.

---

[1] Father signed and executed a Consent to Adoption relating to K.J.V.

[2] At the hearing, Mother's counsel asked: "And then there was the guardianship case, which lasted for many years; is that correct?"  Transcript Volume II at 189.  Mother answered: "Yes.  Which never would have happened if I had never done what I was duped into doing."  *Id.*

was appointed as K.J.V.'s guardian under Cause No. 151, E.B. relocated to California with K.J.V., and DCS received a report in August 2017 alleging concerns regarding E.B.'s mental health. DCS alleged that K.J.V. disclosed on September 1, 2017, to California CPS that E.B. had a "disease that makes [her] freak out," E.B. attempted to spray Lysol on her, and she had not been fed. Exhibits Volume I at 190. DCS asserted that California CPS detained K.J.V. and placed her in foster care, DCS spoke with E.B. by phone on December 18, 2017, and she claimed to be in Wisconsin and said she takes mood stabilizers but was not on her medication and had been diagnosed with "something schizophrenic disorder." *Id.* DCS also alleged that California CPS flew K.J.V. back to St. Joseph County on December 21, 2017, Mother and Father's supervised visits with K.J.V. had been suspended in the guardianship case since August 2015, and she lacked an appropriate caregiver.

[5] In February 2018, K.J.V. was adjudicated to be a CHINS. On March 14, 2018, the court entered a dispositional order. On July 9, 2019, the court entered an Order on Modification of Dispositional Decree ordering Mother to write a letter to K.J.V. with the assistance of her therapist and engage in two therapeutically supervised telephone visitations with K.J.V.

[6] On September 5, 2019, DCS filed a petition to terminate Mother's parental rights. During hearings held in November and December 2019, DCS presented the testimony of Family Case Manager Rachel Cohen ("FCM Cohen"); Dr. Anthony Berardi, a clinical and forensic psychologist; Kyra Clark, a case manager employed by Dockside Services; Stacy Hellinga, a therapist; G.C.,

who had K.J.V. in her care for almost two years; Janel Quillin, a licensed clinical social worker and registered play therapy supervisor; and Guardian ad Litem Marielena Duerring ("GAL Duerring"). Mother's counsel presented the testimony of Mother, Mother's husband, and D.D., Mother's son.

[7] On January 24, 2020, the court entered an order terminating Mother's parental rights. The court found:

> 7. [K.J.V.] is currently the subject of an open guardianship under [Cause No. 151]. [E.B.] (hereinafter "Guardian") was appointed [K.J.V.'s] guardian on April 4, 2014.
>
> 8. In August of 2017, Guardian and [K.J.V.] relocated to California. [K.J.V.'s] Guardian Ad Litem, Marielena Duerring, credibly testified at great lengths about the circumstances under the guardianship matter that led to the relocation. As credibly outlined by Ms. Duerring, Guardian filed a Petition to Relocate[] to California, which initially Ms. Duerring objected to.
>
> 9. Mother was exercising visitation with [K.J.V.] under the guardianship matter. Unfortunately, Mother's visitation was terminated from two (2) separate visitation facilities due to Mother's inappropriate behavior as credibly testified to by Ms. Duerring. Ms. Duerring credibly testified that she recommend[s] that Mother's visitation with [K.J.V.] be suspended, which was granted by the guardianship Court.
>
> 10. After Mother's visitation was suspended with [K.J.V.], Guardian once again filed another request to relocate to California. Ms. Duerring credibly testified that she agreed to the request at that time, since Mother's visitation was suspended, and [K.J.V.] and Guardian relocated to California.
>
> 11. While in California, the California Child Protective Services became involved due to the Guardian's mental health and

stability. At that time, the California Court involved with the family allowed the Mother to exercise visitation with [K.J.V.], contrary to the Order issued in Indiana. Mother testified that while [K.J.V.] was in custody of the California Child Protective Services, she exercised weekly visitation with [K.J.V.].

12. In November of 2017, a communication occurred between the California court who had custody of [K.J.V.] and Judge James Fox from the St. Joseph Probate Court as authorized under Indiana Code § 31-21-4-1. Ms. Duerring testified credibly that after that UCCJA proceeding the case returned to Indiana for further proceedings.

13. The DCS filed a Petition alleging that [K.J.V.] was a Child in Need of Services (hereinafter "CHINS") on December 22, 2017 under Cause Number 71J01-1712-JC-0000994. . . .

14. [K.J.V.] was previously adjudicated a CHINS under Cause Number 71J01-1105-JC-000124 due to being diagnosed as failure to thrive and concerns with Mother dosing the child with allergy medication in her bottle. *See State's Exhibit B*.

15. On December 27, 2017, a Detention Hearing was held. This Court authorized [K.J.V.'s] continued detention and continued the suspension of visitation for Mother and Father.

16. [K.J.V.] has never returned to the care of Mother, Father, or Guardian since December 27, 2017. [K.J.V.] has not resided in Mother's care since the guardianship was granted in 2014.

17. On February 7, 2018, Mother entered an admission to the CHINS Petition. Father failed to appear after appropriate notice that day, and the Court adjudicated [K.J.V.] a CHINS.

18. A Dispositional Order was entered by this Court for [K.J.V.] on March 14, 2018.

19. . . . The Court also declined to order visitation for Mother until visitation was therapeutically recommended.

20. FCM Cohen testified credibly that Mother completed all of her services.

21. Based on Mother's progression in services, FCM Cohen credibly testified that Mother began therapeutic visitation during the summer of 2018. [K.J.V.'s] therapist, Janel Quillin, supervised that visitation between Mother and [K.J.V.]. Ms. Quillin credibly testified that she met with Mother on May 3, 2018. Ms. Quillin testified credibly that the session went "okay." She further credibly testified that Mother had difficulty not talking about the Guardian, and that Mother was "tearful and angry." Ms. Quillin further credibly testified that Mother believed people were alienating [K.J.V.] from Mother.

22. Mother testified that her visitation with [K.J.V.] in California went well and that [K.J.V.] was "very affectionate" with Mother during those visits. Ms. Quillin, [K.J.V.'s] therapist from January 2018 till March 2019, agreed that the California visits appeared to go well from the reports she reviewed.

23. On June 14, 2018, Mother had her first therapeutic visitation with [K.J.V.]. Ms. Quillin credibly testified that [K.J.V.] was very fearful of having the visit. Ms. Quillin credibly testified that she talked about the rules of the visit with Mother, which included no recording, letting [K.J.V.] lead the visit, and advising Mother that [K.J.V.] was scared of Mother yelling at her again. Ms. Quillin credibly testified that [K.J.V.] was very tearful when the visit began, and then suddenly, [K.J.V.] just stopped crying. Ms. Quillin testified credibly that she thought [K.J.V.'s] behavior was unusual because there was no transition from the crying to stopping, and there was a belief [K.J.V.] disassociated during the visitation. During the visitation, Mother asked [K.J.V.] for hugs and kisses, all of which [K.J.V.] continued to resist, until the end of the visitation, when [K.J.V.] did hug Mother.

24. On July 12, 2018, Ms. Quillin met with [K.J.V.] to work on what rules [K.J.V.] wanted for her next therapeutic visit with Mother. Ms. Quillin testified that [K.J.V.] wanted no hugs, no

kisses, for Mother to not request [K.J.V.] call her mom, no pressures for affection, for Mother to stay three (3) feet away from her at all times, and for Mother not to force [K.J.V.] to come in.

25. Prior to the next therapeutic visitation, Ms. Quillin credibly testified that Mother sent her a text message stating that [G.C.], the foster mother, should not be present at the drop-off for visits. Before the visit, Ms. Quillin credibly testified that Mother told her that Mother believed [G.C.] was causing parental alienation of her and [K.J.V.].

26. On July 17, 2018, Mother had her second supervised visit with [K.J.V.]. According to the credible testimony of Ms. Quill[i]n, the visit went very poorly. [K.J.V.] had made a list of thoughts she wanted to share with Mother, including telling Mother that she did not want to live with her, according to the credible testimony of Ms. Quill[i]n. Mother began yelling at [K.J.V.], which was a fear of [K.J.V.'s] that she had previously shared with Ms. Quill[i]n. Ms. Quill[i]n credibly testified that [K.J.V.] left the visit and was very upset.

27. After the July 17, 2018 [visit], Ms. Quillin credibly testified that she could no longer recommend any ongoing visitation because she believed any further visits would be "emotionally detrimental" to [K.J.V.].

28. The events of July 17, 2018 were not the first time that Mother's behavior led to her visitation be[ing] terminated in a supervised visitation agency. Kyra Clark, a case manager for Dockside, credibly testified that in 2015, she supervised visitation between Mother and [K.J.V.]. Ms. Clark credibly testified that on November 3, 2015, Mother was visiting with [K.J.V.] and Mother was redirected regarding her questioning of [K.J.V.]. Ms. Clark credibly testified that Mother became agitated and [K.J.V.] was removed from the visit. Ms. Clark credibly testified that Mother was using foul language and aggressive mannerisms that necessitated the need for the police to be called. After that

visit, Ms. Clark testified credibly that Dockside terminated the supervised visitation due to Mother's behavior.

29. Mother's inability to control herself and appropriately manage her behavior was unfortunately a common topic in testimony. FCM Rachel Cohen credibly testified that at times Mother was "rude and nasty." Ms. Duerring, the Guardian Ad Litem, credibly testified that Mother was very angry with her when Ms. Duerring pushed Mother to accept some responsibility for Mother's role in the case, and that Ms. Duerring found Mother's and Mother's husband's[] behavior threatening.

30. Dr. Anthony Berardi, a clinical and forensic psychologist, also found concerns with Mother's behavior. On March 20, 2019, Dr. Berardi conducted a psychological examination of [K.J.V.] to determine if [K.J.V.] was a victim of parental alienation by the foster parents . . . as Mother had continuously alleged to be true. *See State's Exhibit E*. As part of that evaluation, Dr. Berardi credibly testified that he conducted an interview with Mother. Dr. Berardi credibly described Mother as "emotionally reactive." Dr. Berardi credibly testified that during the interview Mother was "very difficult to contain" and accused Ms. Duerring of interfering with her parent-child relationship.

31. Dr. Berardi testified credibly that Mother had many psychological and mental health concerns. He credibly testified that Mother was taking large doses of benzodiazepines and Suboxune [sic] for pain management. He further credibly opined that he was concerned with Mother's chronic major depressive episodes. Dr. Berardi credibly testified that he found grandiosity in Mother's thinking, and that Mother demonstrated personality disorder traits, including histrionic, impulsivity, and a paranoid thought process.

32. Dr. Berardi also made diagnoses for [K.J.V.] as well. He credibly testified that [K.J.V.] suffered from persistent depressive disorder, anxiety, and feelings of low self-worth.

33. Dr. Berardi credibly testified that for [K.J.V.'s] psychological safety and future welfare, the [foster family] should adopt her. He further credibly found and opined that [K.J.V.] was not the victim of parental alienation, and rather, it was "a handy defense used by [Mother] to portray herself as a victim when [K.J.V.] is really the victim." Dr. Berardi credibly testified that any relationship with Mother would be a threat to [K.J.V.'s] well-being, and that it would be in [K.J.V.'s] best interest to recommend the Court terminate parental rights. Dr. Berardi further credibly testified that removing [K.J.V.] from the [foster family] would not only cause [K.J.V.] anxiety, but a "pretty substantial breakdown."

34. Even with that report, the Department continued to attempt to repair Mother's relationship with [K.J.V.]. On July 9, 2019, after an extremely contested hearing, this Court approved a modification to allow Mother to begin working toward building a relationship with [K.J.V.]. The Order on Modification of Dispositional Decree allowed the Mother to write a letter to [K.J.V.] with the assistance of her therapist. After [K.J.V.] was able to process the letter in therapy, Mother was authorized to have up to (2) telephonic visits with [K.J.V.].

35. The first, and only, telephone visit lasted approximately ten (10) minutes per the credible testimony of FCM Cohen. FCM Cohen testified that [K.J.V.] was extremely anxious and very nervous about the phone call and required the use of a weighted blanket during the course of the visit. While Mother was appropriate during the phone call, [K.J.V.] was very vocal in talking about how she was uncomfortable and "her desire to live with her current family." *See Respondent's Exhibit 1*.

36. Dr. Brad Mazick supervised the phone visit between Mother and [K.J.V.]. Dr. Mazick summarized the visit and his recommendations in an email to the DCS. *See Respondent's Exhibit 1*. Dr. Mazick wrote, when discussing the telephone call, "However, I am fairly certain this did not change anything for [K.J.V.]. While not awful and inappropriate, it likely wasn't

productive to [K.J.V.] and holds little to no meaning." Dr. Mazick further continued that while Mother handled the telephone call pretty well, Mother's desires in regarding to [K.J.V.] have not changed. He wrote, "While I think [Mother] is a bit more realistic and open to suggestions to the process – [Mother's] end goal remains the same – having [K.J.V.] back (fully) in her life – which is something that [K.J.V.] is totally against."

37. To say that [K.J.V.] is totally against reunification would be minimizing how strongly [K.J.V.] has expressed her feelings against living with Mother. Prior to the telephone visit with Mother, Stacy Hellinga, [K.J.V.'s] current therapist, credibly testified that [K.J.V.] questioned whether if she hurt herself would she be required to have the telephone conversation with Mother. Ms. Hellinga credibly testified that she would not recommend any further visitation between Mother and [K.J.V.] because continuing visitation would cause [K.J.V.] extreme harm and regressions.

38. [K.J.V.] is currently in kinship placement with the [foster family]. [G.C.] credibly testified that when [K.J.V.] was placed in their home, she was incredibly argumentative, lacked appropriate boundaries, physically attacked her school peers, and overall lacked self-control. [G.C.] credibly testified that [K.J.V.] is a different child now and is not so reclusive any more.

39. The plan of care for [K.J.V.] is adoption with a concurrent plan of reunification as approved by this Court on July 9, 2019. [G.C.] credibly testified her family would be willing to adopt [K.J.V.]. Dr. Berardi credibly testified that it is in [K.J.V.'s] best interest for Mother's parental rights to be terminated and for the [foster family] to adopt [K.J.V.]. He further credibly opined that removing [K.J.V.] from the [foster family] would lead to a pretty substantial breakdown for [K.J.V.].

Appellant's Appendix Volume II at 35-38. The court concluded there was a reasonable probability that continuation of the parent-child relationship posed a threat to the well-being of the child, termination of the parent-child relationship was in the child's best interests, and there was a satisfactory plan for care and treatment of the child.

### Discussion

Mother argues that no evidence was presented that she posed a physical threat to K.J.V., she completed all services, there was no finding her home was inappropriate, and the reasons stated by the trial court for termination were not the same reasons K.J.V. was removed from the home. DCS argues that termination was necessary to preserve K.J.V.'s emotional development and mental health and that the court did not err in concluding it was reasonably probable continuing the parent-child relationship posed a threat to K.J.V.'s well-being.

In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[10] A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence. Ind. Code § 31-37-14-2. We do not reweigh the evidence or determine the credibility of witnesses but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*. We give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *Id*. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

[11] The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Mother concedes that K.J.V. has been adjudicated a child in need of services on

two separate occasions. Further, we observe that the trial court also found that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of K.J.V. "Clear and convincing evidence need not reveal that 'the continued custody of the parents is wholly inadequate for the child's very survival.'" *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009) (quoting *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005) (quoting *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1233 (Ind. 1992))), *reh'g denied*. "Rather, it is sufficient to show by clear and convincing evidence that 'the child's emotional and physical development are threatened' by the respondent parent's custody." *Id.* (quoting *Bester*, 839 N.E.2d at 148 (quoting *Egly*, 592 N.E.2d at 1234)).

[12] To the extent Mother does not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[13] The trial court's order concludes:

> 3. There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of [K.J.V.].
>
> * * * * *
>
> b. Continuing the parent-child relationship would not only be a threat to [K.J.V.'s] mental and emotional well-being, but would instead destroy [K.J.V.'s] mental and emotional well-being. Dr. Berardi credibly testified that any continued relationship between

[K.J.V.] and Mother would be a threat to [K.J.V.'s] well-being. Dr. Berardi further credibly opined that for [K.J.V.'s] "psychological safety and future welfare," she needed to be adopted by the [foster family]. Dr. Berardi, in the psychological evaluation he completed on [K.J.V.], credibly concluded that "future contact between [K.J.V.] and [Mother] is not recommended and would like[ly] contribute to more disruption and regression in [K.J.V.'s] functioning." This Court could not agree more.

c. While it is not contested that Mother completed the services Ordered by this Court, the damage that has been inflicted on [K.J.V.] and her relationship with Mother is much too severe. [K.J.V.] had not lived with her Mother since 2014 when she was placed with Guardian. Ms. Clark credibly testified that Mother's visitation with [K.J.V.] was terminated from Dockside due to Mother's behavior. Ms. Duerring credibly testified that she recommended, as [K.J.V.'s] Guardian Ad Litem in the guardianship matter, that Mother's visitation be suspended with [K.J.V.]. Ms. Duerring credibly testified that Mother's behavior was inappropriate and that Mother was never able to take responsibility for her actions. Ms. Duerring testified that Mother consistently blamed others for her broken relationship with [K.J.V.].

d. Mother's own testimony, while difficult to follow and incredible, did corroborate Mother's inability to accept any responsibility for her actions. When questioned by DCS about if Mother had ever made any mistakes in regards to this case, Mother's answers were focused on Guardian's involvement in the case and trusting certain people.

e. This is the pattern of Mother's thinking and what makes Mother's continued relationship with Mother a threat to [K.J.V.'s] well-being. When Mother was given an opportunity to visit with [K.J.V.] over the summer of 2018, Mother did the exact thing that frightened [K.J.V.] – yelling at her. [K.J.V.'s] reaction to Mother's yelling was so severe that visitation was once again

suspended. Mother testified that without being prepared to hear the things [K.J.V.] told her at that visit, there was "nothing she could have done differently."

f. Dr. Berardi also credibly testified that Mother is convinced that DCS, [G.C.], Ms. Duerring, and the child's therapist were all involved in a plan to alienate [K.J.V.] from Mother. Dr. Berardi ruled out parental alienation of [K.J.V.], and instead credibly testified that parental alienation was a "handy defense" used by Mother in order to portray herself as the victim.

g. [K.J.V.] is terrified of her Mother. Ms. Hellinga, [K.J.V.'s] therapist, testified that once Mother was allowed to have a telephone communication with [K.J.V.], [K.J.V.] disclosed feeling of self-harm in order to avoid future telephone calls with Mother. She further credibly testified that she could not recommend any additional communication between Mother and [K.J.V.] because it would cause extreme harm and regression to [K.J.V.]. This opinion was credibly testified to by [K.J.V.'s] previous therapist, Janel Quillin, as well. Ms. Quillin credibly testified that, when she stopped seeing [K.J.V.] in March of 2019, any additional visitation between [K.J.V.] and Mother would be emotionally detrimental to [K.J.V.].

h. Mother argued that there were other ways to work toward reunification, namely as outlined by Dr. Mazick. *See Respondent's Exhibit 1*. Dr. Mazick writes, "I further wonder that if [K.J.V.] had some sense of security with her family whom she feels safe with (possibly for the first time in her life then having some potential of [Mother] in her life would not be so threatening." The Court finds this statement highly compelling. Dr. Mazick acknowledges how threatened [K.J.V.] is by her relationship with Mother. The only way to provide the security he mentions is through termination of Mother's parental rights.

[i]. In addition, Dr. Mazick's observations and interactions with [K.J.V.] were very limited. Per Mother's own admission, Dr. Mazick only met with [K.J.V.] twice during the course of the

case and was provided evidence from Mother. This Court finds the testimony of Ms. Quillin and Ms. Hell[i]nga, [K.J.V.'s] therapists, and Dr. Berardi substantially more credible in regards to [K.J.V.'s] mental health needs.

j. "Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened." *In re S.K.* at 1234. The Court finds that the evidence presented by the DCS supports by clear and convincing evidence that the continuation of Mother's parent-child relationship with [K.J.V.] does not only threaten her emotional development, it seriously endangers it.

k. Mother's inability to accept any responsibility in the breakdown of her relationship with [K.J.V.], Mother's pattern of inappropriate behavior with almost every person involved in [K.J.V.'s] care, as well as the deep mental and emotional issues any attempt to work toward even visits between Mother and [K.J.V.] would cause [K.J.V.] demonstrates by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the well-being of [K.J.V.].

Appellant's Appendix Volume II at 38-39.

[14] When asked if she believed that continuing the parent-child relationship posed a threat to K.J.V.'s well-being, FCM Cohen answered: "Yes. Maybe not her physical well-being, but definitely her emotional and psychological well-being." Transcript Volume II at 29. Dr. Berardi testified that "they carried off a couple of visits which ended rather disastrously with [Mother] yelling at her daughter, scaring her to the extent that she ran out of the office, and that pretty much ended the visits." *Id.* at 51. He also testified that K.J.V. is "really riddled with a lot of anxiety," "suffers with persistent depressive disorder," and "[t]his is

what they acquire and they acquire it usually in homes where they've been neglected, invalidated, abused, and not provided the nurturing and positive supports that they need, and this is the way she presents." *Id.* at 54. Quillin, the licensed clinical social worker and registered play therapy supervisor, testified that she recommended no further visits between K.J.V. and Mother and "felt that they would be emotionally detrimental for [K.J.V.] and traumatic." *Id.* at 117. When asked if she believed that continuing the parent-child relationship between [K.V] and K.J.V. was a threat to K.J.V.'s well-being, GAL Duerring answered affirmatively. We conclude that clear and convincing evidence supports the trial court's determination that the continuation of the parent-child relationship poses a threat to K.J.V.'s well-being.

[15] To the extent Mother challenges the trial court's finding that termination of the parent-child relationship is in the best interest of K.J.V., we note that in determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*

[16] When asked if she believed that termination of Mother's parental rights was in K.J.V.'s best interests, FCM Cohen answered: "Unfortunately, this is the worst question I have as a worker, I hate answering this question, but yes. It is definitely in [K.J.V.'s] best interest to have her relationship between mother and

her terminated." Transcript Volume II at 31. Dr. Berardi testified: "I feel very confident that for this child's best interest, in fact, for her psychological safety and future welfare, that she should be adopted by the [foster family]." *Id.* at 54. When asked what course of action he thought was in K.J.V.'s best interest, he answered: "Well, I would recommend that the Court consider terminating parental rights in this case and having this child have permanency in what she looks at as her forever family . . . ." *Id.* at 55. GAL Duerring testified that Mother's parental rights "need to be terminated." *Id.* at 142. When asked if she believed it was in K.J.V.'s best interest for Mother's parental rights to be terminated, GAL Duerring answered affirmatively. Based on the totality of the evidence, we conclude the trial court's determination that termination is in the children's best interests is supported by clear and convincing evidence.

[17] For the foregoing reasons, we affirm the trial court.

[18] Affirmed.

Robb, J., and Crone, J., concur.